*464 Chief Justice Roberts
delivered the opinion of the Court.
Congress enacted 18 U. S. C. § 48 to criminalize the commercial creation, sale, or possession of certain depictions of animal cruelty. The statute does not address underlying acts harmful to animals, but only portrayals of such conduct. The question presented is whether the prohibition in the statute is consistent with the freedom of speech guaranteed by the First Amendment.
I
Section 48 establishes a criminal penalty of up to five years in prison for anyone who knowingly “creates, sells, or possesses a depiction of animal cruelty,” if done “for commercial *465 gain” in interstate or foreign commerce. § 48(a).[1] A depiction of “animal cruelty” is defined as one “in which a living animal is intentionally maimed, mutilated, tortured, wounded, or killed,” if that conduct violates federal or state law where “the creation, sale, or possession takes place.” § 48(e)(1). In what is referred to as the “exceptions clause,” the law exempts from prohibition any depiction “that has serious religious, political, scientific, educational, journalistic, historical, or artistie value.” §48(b).
The legislative background of § 48 focused primarily on the interstate market for “crush videos.” According to the House Committee Report on the bill, such videos feature the intentional torture and killing of helpless animals, including cats, dogs, monkeys, mice, and hamsters. H. R. Rep. No. 106-397, p. 2 (1999) (hereinafter H. R. Rep.). Crush videos often depict women slowly crushing animals to death “with their bare feet or while wearing high heeled shoes,” *466 sometimes while “talking to the animals in a kind of dominatrix patter” over “[t]he cries and squeals of the animals, obviously in great pain.” Ibid. Apparently these depictions “appeal to persons with a very specific sexual fetish who find them sexually arousing or otherwise exciting.” Id., at 2-3. The acts depicted in crush videos are typically prohibited by the animal cruelty laws enacted by all 50 States and the District of Columbia. See Brief for United States 25, n. 7 (listing statutes). But crush videos rarely disclose the participants' identities, inhibiting prosecution of the underlying conduct. See H. R. Rep., at 3; accord, Brief for State of Florida et al. as Amici Curiae 11.
This case, however, involves an application of § 48 to depictions of animal fighting. Dogfighting, for example, is unlawful in all 50 States and the District of Columbia, see Brief for United States 26, n. 8 (listing statutes), and has been restricted by federal law since 1976. Animal Welfare Act Amendments of 1976, §17, 90 Stat. 421, 7 U.S.C. §2156. Respondent Robert J. Stevens ran a business, “Dogs of Velvet and Steel,” and an associated Web site, through which he sold videos of pit bulls engaging in dogfights and attacking other animals. Among these videos were Japan Pit Fights and Pick-A-Winna: A Pit Bull Documentary, which include contemporary footage of dogfights in Japan (where such conduct is allegedly legal) as well as footage of American dogfights from the 1960’s and 1970's.[2] A third video, Catch Dogs and Country Living, depicts the use of pit bulls to hunt wild boar, as well as a “gruesome” scene of a pit bull attacking a domestic farm pig. 533 F. 3d 218, 221 (CA3 2008) (en banc). On the basis of these videos, Stevens was indicted on three counts of violating §48.
*467 Stevens moved to dismiss the indictment, arguing that § 48 is facially invalid under the First Amendment. The District Court denied the motion; It held that the depictions subject to §48, like obscenity or child pornography, are categorically unprotected by the First Amendment. 2:04-cr-00051-ANB (WD Pa., Nov. 10, 2004), App. to Pet. for Cert. 65a-71a. It went on to hold that §48 is not substantially overbroad, because the exceptions clause sufficiently narrows the statute to constitutional applications. Id., at 71a-75a. The jury convicted Stevens on all counts, and the District Court sentenced him to three concurrent sentences of 37 months’ imprisonment, followed by three years of supervised release. App. 37.
The en banc Third Circuit, over a three-judge dissent, declared §48 facially unconstitutional and vacated Stevens’s conviction. 533 F. 3d 218. The Court of Appeals first held that §48 regulates speech that is protected by the First Amendment. The Court declined to recognize a new category of unprotected speech for depictions of animal cruelty, id., at 224, and n. 6, and rejected the Government’s analogy between animal cruelty depictions and child pornography, id., at 224-232.
The Court of Appeals then held that §48 could not survive strict scrutiny as a content-based regulation of protected speech. Id., at 232. It found that the statute lacked a compelling Government interest and was neither narrowly tailored to preventing animal cruelty nor the least restrictive means of doing so. Id., at 232-235. It therefore held §48 facially invalid.
In an extended footnote, the Third Circuit noted that §48 “might also be unconstitutionally overbroad,” because it “potentially covers a great deal of constitutionally protected speech” and “sweeps [too] widely” to be limited only by prosecutorial discretion. Id., at 235, n. 16. But the Court of Appeals declined to rest its analysis on this ground.
We granted certiorari. 556 U. S. 1181 (2009).
*468 II
The Government’s primary submission is that §48 necessarily complies with the Constitution because the banned depictions of animal cruelty, as a class, are categorically unprotected by the First Amendment. We disagree.
The First Amendment provides that “Congress shall make no law . . . abridging the freedom of speech.” “[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.” Ashcroft v. American Civil Liberties Union, 535 U. S. 564, 573 (2002) (internal quotation marks omitted). Section 48 explicitly regulates expression based on content: The statute restricts “visual [and] auditory depietion[s],” such as photographs, videos, or sound recordings, depending on whether they depict conduct in which a living animal is intentionally harmed. As such, §48 is “‘presumptively invalid,’ and the Government bears the burden to rebut that presumption.” United States v. Playboy Entertainment Group, Inc., 529 U. S. 803, 817 (2000) (quoting R. A. V. v. St. Paul, 505 U. S. 377, 382 (1992); citation omitted).
“From 1791 to the present,” however, the First Amendment has “permitted restrictions upon the content of speech in a few limited areas,” and has never “inelude[d] a freedom to disregard these traditional limitations.” Id., at 382-383. These “historic and traditional categories long familiar to the bar,” Simon & Schuster, Inc. v. Members of N. Y. State Crime Victims Bd., 502 U.S. 105, 127 (1991) (Kennedy, J., concurring in judgment) — including obscenity, Roth v. United States, 354 U. S. 476, 483 (1957), defamation, Beauharnais v. Illinois, 343 U. S. 250, 254-255 (1952), fraud, Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U. S. 748, 771 (1976), incitement, Brandenburg v. Ohio, 395 U. S. 444, 447-449 (1969) (per curiam), and speech integral to criminal conduct, Giboney v. Empire Storage & Ice Co., 336 U. S. 490, 498 (1949) — are “well-defined *469 and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem,” Chaplinsky v. New Hampshire, 315 U. S. 568, 571-572 (1942).
The Government argues that '‘depictions of animal cruelty” should be added to the list. It contends that depictions of “illegal acts of animal cruelty” that are “made, sold, or possessed for commercial gain” necessarily “lack expressive value,” and may accordingly “be regulated as unprotected speech.” Brief for United States 10 (emphasis added). The claim is not just that Congress may regulate depictions of animal cruelty subject to the First Amendment, but that these depictions are outside the reach of that Amendment altogether — that they fall into a “‘First Amendment Free Zone.’” Board of Airport Comm’rs of Los Angeles v. Jews for Jesus, Inc., 482 U. S. 569, 574 (1987).
As the Government notes, the prohibition of animal cruelty itself has a long history in American law, starting with the early settlement of the Colonies. Reply Brief 12, n. 8; see, e. g., The Body of Liberties § 92 (Mass. Bay Colony 1641), reprinted in American Historical Documents 1000-1904, 43 Harvard Classics 66, 79 (C. Eliot ed. 1910) (“No man shall exercise any Tirranny or Crueltie towards any bruite Creature which are usuallie kept for man’s use”). But we are unaware of any similar tradition excluding depictions of animal cruelty from “the freedom of speech” codified in the First Amendment, and the Government points us to none.
The Government contends that “historical evidence” about the reach of the First Amendment is not “a necessary prerequisite for regulation today,” Reply Brief 12, n. 8, and that categories of speech may be exempted from the First Amendment’s protection without any long-settled tradition of subjecting that speech to regulation. Instead, the Government points to Congress’s “ ‘legislative judgment that... depictions of animals being intentionally tortured and killed [are] of such minimal redeeming value as to render [them] *470 unworthy of First Amendment protection/ ” Brief for United States 28 (quoting 538 F. 3d, at 243 (Cowen, J., dissenting)), and asks the Court to uphold the ban on the same basis. The Government thus proposes that a claim of categorical exclusion should be considered under a simple balancing test: “Whether a given category of speech enjoys First Amendment protection depends upon a categorical balancing of the value of the speech against its societal costs.” Brief for United States 8; see also id., at 12.
As a free-floating test for First Amendment coverage, that sentence is startling and dangerous. The First Amendment’s guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits. The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs. Our Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is not worth it. The Constitution is not a document “prescribing limits, and declaring that those limits may be passed at pleasure.” Marbury v. Madison, 1 Cranch 137, 178 (1803).
To be fair to the Government, its view did not emerge from a vacuum. As the Government correctly notes, this Court has often described historically unprotected categories of speech as being “ ‘of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.’” R. A. V., supra, at 383 (quoting Chaplinsky, supra, at 572). In New York v. Ferber, 458 U. S. 747 (1982), we noted that within these categories of unprotected speech, “the evil to be restricted so overwhelmingly outweighs the expressive interests, if any, at stake, that no process of case-by-ease adjudication is required,” because “the balance of competing interests is clearly struck,” id., at 763-764. The Government derives its proposed test from these descriptions in our precedents. See Brief for United States 12-13.
*471 But such descriptions are just that — descriptive. They do not set forth a test that may be applied as a general matter to permit the Government to imprison any speaker so long as his speech is deemed valueless or unnecessary or so long as an ad hoc calculus of costs and benefits tilts in a statute’s favor.
When we have identified categories of speech as fully outside the protection of the First Amendment, it has not been on the basis of a simple cost-benefit analysis. In Ferber, for example, we classified child pornography as such a category, 458 U. S., at 763. We noted that the State of New York had a compelling interest in protecting children from abuse, and that the value of using children in these works (as opposed to simulated conduct or adult actors) was de minimis. Id., at 756-757, 762. But our decision did not rest on this “balance of competing interests” alone. Id., at 764. We made clear that Ferber presented a special case: The market for child pornography was “intrinsically related” to the underlying abuse, and was therefore “an integral part of the production of such materials, an activity illegal throughout the Nation.” Id., at 759, 761. As we noted, “‘[i]t rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute.’” Id., at 761-762 (quoting Giboney, 336 U. S., at 498). Ferber thus grounded its analysis in a previously recognized, long-established category of unprotected speech, and our subsequent decisions have shared this understanding. See Osborne v. Ohio, 495 U. S. 103, 110 (1990) (describing Ferber as finding “persuasive” the argument that the advertising and sale of child pornography was “an integral part” of its unlawful production (internal quotation marks omitted)); Ashcroft v. Free Speech Coalition, 535 U. S. 234, 249-250 (2002) (noting that distribution and sale “were intrinsically related to the sexual abuse of children,” giving the speech at issue “a proximate link to the crime from which it came” (internal quotation marks omitted)).
*472 Our decisions in Ferber and other cases cannot be taken as establishing a freewheeling authority to declare new categories of speech outside the scope of the First Amendment. Maybe there are some categories of speech thát have been historically unprotected, but have not yet been specifically identified or discussed as such in our case law. But if so, there is no evidence that “depictions of animal cruelty” is among them. We need not foreclose the future recognition of such additional categories to reject the Government’s highly manipulable balancing test as a means of identifying them.
III
Because we decline to carve out from the First Amendment any novel exception for § 48, we review Stevens’s First Amendment challenge under our existing doctrine.
A
Stevens challenged § 48 on its face, arguing that any conviction secured under the statute would be unconstitutional. The court below decided the case on that basis, 533 F. 3d, at 231, n. 13, and we granted the Solicitor General’s petition for certiorari to determine “whether 18 U. S. C. 48 is facially invalid under the Free Speech Clause of the First Amendment,” Pet. for Cert. I.
To succeed in a typical facial attack, Stevens would have to establish “that no set of circumstances exists under which [§ 48] would be valid,” United States v. Salerno, 481 U. S. 739, 745 (1987), or that the statute lacks any “plainly legitimate sweep,” Washington v. Glucksberg, 521 U. S. 702, 740, n. 7 (1997) (Stevens, J., concurring in judgments) (internal quotation marks omitted). Which standard applies in a typical case is a matter of dispute that we need not and do not address, and neither Salerno nor Glucksberg is a speech case. Here the Government asserts that Stevens cannot prevail because §48 is plainly legitimate as applied to crush videos and animal fighting depictions. Deciding this case through *473 a traditional facial analysis would require us to resolve whether these applications of § 48 are in fact consistent with the Constitution.
In the First Amendment context, however, this Court recognizes “a second type of facial challenge,” whereby a law may be invalidated as overbroad if “a substantial number of its applications are unconstitutional, judged in relation to the statute’s plainly legitimate sweep.” Washington State Grange v. Washington State Republican Party, 552 U. S. 442, 449, n. 6 (2008) (internal quotation marks omitted). Stevens argues that § 48 applies to common depictions of ordinary and lawful activities, and that these depictions constitute the vast majority of materials subject to the statute. Brief for Respondent 22-25. The Government makes no effort to defend such a broad ban as constitutional. Instead, the Government’s entire defense of §48 rests on interpreting the statute as narrowly limited to specific types of “extreme” material. Brief for United States 8. As the parties have presented the issue, therefore, the constitutionality of §48 hinges on how broadly it is construed. It is to that question that we now turn.[8]
*474 B
As we explained two Terms ago, “[t]he first step in over-breadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers.” United States v. Williams, 553 U. S. 285, 293 (2008). Because §48 is a federal statute, there is no need to defer to a state court’s authority to interpret its own law.
We read §48 to create a criminal prohibition of alarming breadth. To begin with, the text of the statute’s ban on a “ 'depiction of animal cruelty’ ” nowhere requires that the depicted conduct be cruel. That text applies to “any... depiction” in which “a living animal is intentionally maimed, mutilated, tortured, wounded, or killed.” § 48(c)(1). “[M]aimed, mutilated, [and] tortured” convey cruelty, but “wounded” or “killed” do not suggest any such limitation.
The Government contends that the terms in the definition should be read to require the additional element of “accompanying acts of cruelty. ” Reply Brief 6; see also Tr. of Oral Arg. 17-19. (The dissent hinges on the same assumption. See post, at 486-487,489.) The Government bases this argument on the definiendum, “depiction of animal cruelty,” c£ Leocal v. Ashcroft, 543 U. S. 1, 11 (2004), and on “ 'the eommonsense canon of noscitur a sociis.’ ” Reply Brief 7 (quoting Williams, 553 U. S., at 294). As that canon recognizes, an ambiguous term may be “given more precise content by the neighboring words with which it is associated.” Id., at 294. Likewise, an unclear definitional phrase may take meaning from the term to be defined, see Leocal, supra, at 11 (interpreting a ‘“substantial risk’” of the “us[e]” of “physical force” as part of the definition of “ ‘crime of violence’ ”).
But the phrase “wounded ... or killed” at issue here contains little ambiguity. The Government’s opening brief properly applies the ordinary meaning of these words, stating for example that to “'kill’ is ‘to deprive of life.’” Brief for United States 14 (quoting Webster’s Third New Interna *475 tional Dictionary 1242 (1993)). We agree that “wounded” and “killed” should be read according to their ordinary meaning. Cf. Engine Mfrs. Assn. v. South Coast Air Quality Management Dist., 541 U. S. 246, 252 (2004). Nothing about that meaning requires cruelty.
While not requiring cruelty, § 48 does require that the depicted conduct be “illegal.” But this requirement does not limit §48 along the lines the Government suggests. There are myriad federal and state laws concerning the proper treatment of animals, but many of them are not designed to guard against animal cruelty. Protections of endangered species, for example, restrict even the humane “wound[ing] or killing]” of “living animal[s].” § 48(c)(1). Livestock regulations are often designed to protect the health of human beings, and hunting and fishing rules (seasons, licensure, bag limits, weight requirements) can be designed to raise revenue, preserve animal populations, or prevent accidents. The text of § 48(c) draws no distinction based on the reason the intentional killing of an animal is made illegal, and includes, for example, the humane slaughter of a stolen cow.[4]
What is more, the application of § 48 to depictions of illegal conduct extends to conduct that is illegal in only a single jurisdiction. Under subsection (c)(1), the depicted conduct need only be illegal in “the State in which the creation, sale, or possession takes place, regardless of whether the . . . wounding ... or killing took place in [that] State.” A depiction of entirely lawful conduct runs afoul of the ban if that depiction later finds its way into another State where the *476 same conduct is unlawful. This provision greatly expands the scope of §48, because although there may be “a broad societal consensus” against cruelty to animals, Brief for United States 2, there is substantial disagreement on what types of conduct are properly regarded as cruel. Both views about cruelty to animals and regulations having no connection to cruelty vary widely from place to place.
In the District of Columbia, for example, all hunting is unlawful. D. C. Code Munic. Regs., tit. 19, §1560 (June 2004). Other jurisdictions permit or encourage hunting, and there is an enormous national market for hunting-related depictions in which a living animal is intentionally killed. Hunting periodicals have circulations in the hundreds of thousands or millions, see Mediaweek, Sept. 29, 2008, p. 28, and hunting television programs, videos, and Web sites are equally popular, see Brief for Professional Outdoor Media Association et al. as Amici Curiae 9-10. The demand for hunting depictions exceeds the estimated demand for crush videos or animal fighting depictions by several orders of magnitude. Compare ibid, and Brief for National Rifle Association of America, Inc., as Amicus Curiae 12 (hereinafter NRA Brief) (estimating that hunting magazines alone account for $135 million in annual retail sales) with Brief for United States 43-44,46 (suggesting $1 million in crush video sales per year, and noting that Stevens earned $57,000 from his videos). Nonetheless, because the statute allows each jurisdiction to export its laws to the rest of the country, § 48(a) extends to any magazine or video depicting lawful hunting, so long as that depiction is sold within the Nation's Capital.
Those seeking to comply with the law thus face a bewildering maze of regulations from at least 56 separate jurisdictions. Some States permit hunting with crossbows, Ga. Code Ann. §27-3-4(1) (2007); Va. Code Ann. §29.1-519(A)(6) (Lexis 2008 Cum. Supp.), while others forbid it, Ore. Admin. Rule 635-065-0725 (2009), or restrict it only to the disabled, *477 N. Y. Envir. Conserv. Lavs? Ann. §11-0901(16) (West 2005). Missouri allows the “canned” hunting of ungulates held in captivity, Mo. Code Regs. Ann., tit. 3, 10-9.560(1) (2009), but Montana restricts such hunting to certain bird species, Mont. Admin. Rule 12.6.1202(1) (2007). The sharp-tailed grouse may be hunted in Idaho, but not in Washington. Compare Idaho Admin. Code § 13.01.09.606 (2009) with Wash. Admin. Code §232-28-342 (2009).
The disagreements among the States — and the “commonwealthfs], territor[ies], or possession^] of the United States,” 18 U. S. C. § 48(c)(2) — extend well beyond hunting. State agricultural regulations permit different methods of livestock slaughter in different places or as applied to different animals. Compare, e.g., Fla. Stat. Ann. §828.23(5) (West 2006) (excluding poultry from humane slaughter requirements) with Cal. Food & Agrie. Code Ann. § 19501(b) (West 2001) (including some poultry). California has recently banned cutting or “docking” the tails of dairy cattle, which other States permit. 2009 Cal. Legis. Serv. Ch. 344 (S. B. 135) (West). Even cockfighting, long considered immoral in much of America, see Barnes v. Glen Theatre, Inc., 501 U. S. 560, 575 (1991) (Scalia, J., concurring in judgment), is legal in Puerto Rico, see 15 Laws P. R. Ann. §301 (Supp. 2008); Posadas de Puerto Rico Associates v. Tourism Co. of P. R., 478 U. S. 328, 342 (1986), and was legal in Louisiana until 2008, see La. Rev. Stat. Ann. §14:102.23 (West) (effective Aug. 15, 2008). An otherwise-lawful image of any of these practices, if sold or possessed for commercial gain within a State that happens to forbid the practice, falls within the prohibition of § 48(a).
C
The only thing standing between defendants who sell such depictions and five years in federal prison — other than the mercy of a prosecutor — is the statute’s exceptions clause. Subsection (b) exempts from prohibition “any depiction that has serious religious, political, scientific, educational, jour *478 nalistic, historical, or artistic value.” The Government argues that this clause substantially narrows the statute’s reach: News reports about animal cruelty have “journalistic” value; pictures of bullfights in Spain have “historical” value; and instructional hunting videos have “educational” value. Reply Brief 6. Thus, the Government argues, §48 reaches only crush videos, depictions of animal fighting (other than Spanish bullfighting, see Brief for United States 47-48), and perhaps other depictions of “extreme acts of animal cruelty.” Id., at 41.
The Government’s attempt to narrow the statutory ban, however, requires an unrealistically broad reading of the exceptions clause. As the Government reads the clause, any material with “redeeming societal value,” id., at 9, 16, 23, “ ‘at least some minimal value,’ ” Reply Brief 6 (quoting H. R. Rep., at 4), or anything more than “scant social value,” Reply Brief 11, is excluded under § 48(b). But the text says “serious” value, and “serious” should be taken seriously. We decline the Government’s invitation — advanced for the first time in this Court — to regard as “serious” anything that is not “scant.” (Or, as the dissent puts it, “ ‘trifling.’ ” Post, at 487.) As the Government recognized below, “serious” ordinarily means a good bit more. The District Court’s jury instructions required value that is “significant and of great import,” App. 132, and the Government defended these instructions as properly relying on “a commonly accepted meaning of the word ‘serious,’ ” Brief for United States in No. 05-2497 (CA3), p. 50.
Quite apart from the requirement of “serious” value in § 48(b), the excepted speech must also fall within one of the enumerated categories. Much speech does not. Most hunting videos, for example, are not obviously instructional in nature, except in the sense that all life is a lesson. According to Safari Club International and the Congressional Sportsmen’s Foundation, many popular videos “have primarily entertainment value” and are designed to “entertai[n] the *479 viewer, marke[t] hunting equipment, or increas[e] the hunting community.” Brief for Safari Club International et al. as Amici Curiae 12. The National Rifle Association agrees that “much of the content of hunting media ... is merely recreational in nature.” NR A Brief 28. The Government offers no principled explanation why these depictions of hunting or depictions of Spanish bullfights would be inherently valuable while those of Japanese dogfights are not. The dissent contends that hunting depictions must have serious value because hunting has serious value, in a way that dogfights presumably do not. Post, at 487-488. But § 48(b) addresses the value of the depictions, not of the underlying activity. There is simply no adequate reading of the exceptions clause that results in the statute’s banning only the depictions the Government would like to ban.
The Government explains that the language of § 48(b) was largely drawn from our opinion in Miller v. California, 413 U. S. 15 (1973), which excepted from its definition of obscenity any material with “serious literary, artistic, political, or scientific value,” id., at 24. See Reply Brief 8, 9, and n. 5. According to the Government, this incorporation of the Miller standard into § 48 is therefore surely enough to answer any First Amendment objection. Reply Brief 8-9.
In Miller we held that “serious” value shields depictions of sex from regulation as obscenity. 413 U. S., at 24-25. Limiting Miller's exception to “serious” value ensured that “ ‘[a] quotation from Voltaire in the flyleaf of a book [would] not constitutionally redeem an otherwise obscene publication.’ ” Id., at 25, n. 7 (quoting Kois v. Wisconsin, 408 U. S. 229, 231 (1972) (per curiam)). We did not, however, determine that serious value could be used as a general precondition to protecting other types of speech in the first place. Most of what we say to one another lacks “religious, political, scientific, educational, journalistic, historical, or artistie value” (let alone serious value), but it is still sheltered from Government regulation. Even “ ‘[w]holly neutral fútil *480 ities ... come under the protection of free speech as fully as do Keats’ poems or Donne’s sermons.’” Cohen v. California, 403 U. S. 15, 25 (1971) (quoting Winters v. New York, 333 U. S. 507, 528 (1948) (Frankfurter, J., dissenting); alteration in original).
Thus, the protection of the First Amendment presumptively extends to many forms of speech that do not qualify for the serious-value exception of § 48(b), but nonetheless fall within the broad reach of § 48(c).
D
Not to worry, the Government says: The Executive Branch construes §48 to reach only “extreme” cruelty, Brief for United States 8, and it “neither has brought nor will bring a prosecution for anything less,” Reply Brief 6-7. The Government hits this theme hard, invoking its prosecutorial discretion several times; See id., at 6-7, 10, and n. 6, 19, 22. But the First Amendment protects against the Government; it does not leave us at the mercy of noblesse oblige. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly. Gf. Whitman v. American Trucking Assns., Inc., 531 U. S. 457, 473 (2001).
This prosecution is itself evidence of the danger in putting faith in Government representations of prosecutorial restraint. When this legislation was enacted, the Executive Branch announced that it would interpret §48 as covering only depictions “of wanton cruelty to animals designed to appeal to a prurient interest in sex.” See Statement by President William J. Clinton upon Signing H. R. 1887, 34 Weekly Comp, of Pres. Doc. 2557 (1999). No one suggests that the videos in this case fit that description. The Government’s assurance that it will apply §48 far more restrietively than its language provides is pertinent only as an implicit acknowledgment of the potential constitutional problems with a more natural reading.
*481 Nor can we rely upon the canon of construction that “ambiguous statutory language [should] be construed to avoid serious constitutional doubts.” FCC v. Fox Television Stations, Inc., 556 U. S. 502, 516 (2009). “[T]his Court may impose a limiting construction on a statute only if it is ‘readily susceptible’ to such a construction.” Reno v. American Civil Liberties Union, 521 U. S. 844, 884 (1997). We “‘will not rewrite a... law to conform it to constitutional requirements,’” id., at 884-885 (quoting Virginia v. American Booksellers Assn., Inc., 484 U. S. 383, 397 (1988); omission in original), for doing so would constitute a “serious invasion of the legislative domain,” United States v. Treasury Employees, 513 U. S. 454, 479, n. 26 (1995), and sharply diminish Congress’s “incentive to draft a narrowly tailored law in the first place,” Osborne, 495 U. S., at 121. To read §48 as the Government desires requires rewriting, not just reinterpretation.
* * *
Our construction of §48 decides the constitutional question; the Government makes no effort to defend the constitutionality of §48 as applied beyond crush videos and depictions of animal fighting. It argues that those particular depictions are intrinsically related to criminal conduct or are analogous to obscenity (if not themselves obscene), and that the ban on such speech is narrowly tailored to reinforce restrictions on the underlying conduct, prevent additional crime arising from the depictions, or safeguard public mores. But the Government nowhere attempts to extend these arguments to depictions of any other activities — depictions that are presumptively protected by the First Amendment but that remain subject to the criminal sanctions of §48.
Nor does the Government seriously contest that the presumptively impermissible applications of §48 (properly construed) far outnumber any permissible ones. However “growing” and “lucrative” the markets for crush videos and dogfighting depictions might be, see Brief for United States *482 43, 46 (internal quotation marks omitted), they are dwarfed by the market for other depictions, such as hunting magazines and videos, that we have determined to be within the scope of §48, see supra, at 477. We therefore need not and do not decide whether a statute limited to crush videos or other depictions of extreme animal cruelty would be constitutional. We hold only that § 48 is not so limited but is instead substantially overbroad, and therefore invalid under the First Amendment.
The judgment of the United States Court of Appeals for the Third Circuit is affirmed.

It is so ordered.

 The statute reads in full:
“§ 48. Depiction of animal cruelty
“(a) Creation, Sale, or Possession — Whoever knowingly creates, sells, or possesses a depiction of animal cruelty with the intention of placing that depiction in interstate or foreign commerce for commercial gain, shall be fined under this title or imprisoned not more than 5 years, or both.
“(b) Exception. — Subsection (a) does not apply to any depiction that has serious religious, political, scientific, educational, journalistic, historical, or artistic value.
“(c) Definitions. — In this section-
al) the term ‘depiction of animal cruelty’ means any visual or auditory depiction, including any photograph, motion-picture film, video recording, electronic image, or sound recording of conduct in which a living animal is intentionally maimed, mutilated, tortured, wounded, or killed, if such conduct is illegal under Federal law or the law of the State in which the creation, sale, or possession takes place, regardless of whether the maiming, mutilation, torture, wounding, or killing took place in the State; and
“(2) the term ‘State’ means each of the several States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and any other commonwealth, territory, or possession of the United States.”

 The Government contends that these dogfights were unlawful at the time they occurred, while Stevens disputes the assertion. Reply Brief for United States 25, n. 14 (hereinafter Reply Brief); Brief for Respondent 44, n. 18.

 The dissent contends that because there has not been a ruling on the validity of the statute as applied to Stevens, our consideration of his facial overbreadth claim is premature. Post, at 482, and n. 1, 483, 484 (opinion of Alito, J.). Whether or not that conclusion follows, here no as-applied claim has been preserved. Neither court below construed Stevens’s briefs as adequately developing a separate attack on a defined subset of the statute’s applications (say, dogfighting videos). See 533 F. 3d 218,231, n. 13 (CA3 2008) (en banc) (“Stevens brings a facial challenge to the statute”); App. to Pet. for Cert. 65a, 74a. Neither did the Government, see Brief for United States in No. 05-2497 (CA3), p. 28 (opposing “the appellant’s facial challenge”); accord, Brief for United States 4. The sentence in Stevens’s appellate brief mentioning his unrelated sufficiency-of-the-evidence challenge hardly developed a First Amendment as-applied claim. See post, at 482-483, n. 1. Stevens’s constitutional argument is a general one. And unlike the challengers in Washington State Grange, Stevens does not “rest on factual assumptions . . . that can be evaluated only in the context of an as-applied challenge.” 552 U. S., at 444.

 The citations in the dissent’s appendix are beside the point. The cited statutes stand for the proposition that hunting is not covered by animal cruelty laws. But the reach of § 48 is, as we have explained, not restricted to depictions of conduct that violates a law specifically directed at animal cruelty. It simply requires that the depicted conduct be “illegal.” § 48(c)(1). The Government implicitly admits as much, arguing that “instructional videos for hunting” are saved by the statute’s exceptions clause, not that they fall outside the prohibition in the first place. Reply Brief 6.