**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 24-1293**

───────────

MICHAEL MOSHOURES,

Plaintiff – Appellant,

v.

CITY OF NORTH MYRTLE BEACH; DANA CROWELL, in her official capacity
as Chief of the North Myrtle Beach Department of Public Safety,

Defendants – Appellees.

───────────

Appeal from the United States District Court for the District of South Carolina, at Florence.
Joshua Dawson, III, District Judge. (4:22-cv-02123-JD)

───────────

Argued: October 31, 2024                          Decided: March 11, 2025

───────────

Before DIAZ, Chief Judge, and RICHARDSON and HEYTENS, Circuit Judges.

───────────

Reversed in part and remanded by published opinion. Judge Heytens wrote the opinion, which Chief Judge Diaz and Judge Richardson joined.

───────────

**ARGUED:** Meredith Dyer McPhail, ACLU OF SOUTH CAROLINA, Columbia, South Carolina, for Appellant. Marcus Angelo Manos, MAYNARD NEXSEN, PC, Columbia, South Carolina, for Appellees. **ON BRIEF:** Allen Chaney, ACLU OF SOUTH CAROLINA, Columbia, South Carolina, for Appellant. Elbert S. Dorn, Myrtle Beach, South Carolina, Kirsten E. Small, Greenville, South Carolina, Alexandra H. Austin, Rhett D. Ricard, MAYNARD NEXSEN, PC, Charleston, South Carolina, for Appellees.

───────────

TOBY HEYTENS, Circuit Judge:

A city ordinance makes it a crime "to broadcast obscene, profane or vulgar language from any commercial property" above certain volumes at certain times. A bar owner sued, arguing the ordinance violates the First Amendment. This appeal involves only the portion of the ordinance restricting "vulgar" language.

The district court declined to enjoin the vulgar-language provision because it viewed it as only restricting speech that is obscene as a constitutional matter and thus could be prohibited entirely. We disagree. Applying well-settled principles of statutory construction, we conclude the vulgar-language provision reaches at least some constitutionally protected speech and that it is constitutionally invalid. We thus reverse the district court's judgment in part and remand for further proceedings.

I.

Like many other municipalities, the City of North Myrtle Beach restricts loud sounds in public places. In 2021, the city amended its general noise ordinance to impose special restrictions on "[t]he use of sound equipment to broadcast obscene, profane, or vulgar language from any commercial property, private property, public right-of-way or city property." JA 22. Between 7:01 a.m. and 10:59 p.m., such sounds may be no louder than 30 decibels—roughly equivalent to rustling leaves or a whisper—"as measured from the boundary with the adjacent neighboring commercial property, private property, public right-of-way or city property." *Id.* Between 11:00 p.m. and 7:00 a.m., such sounds cannot exceed 50 decibels—somewhere between average home noise and normal conversation. Like other provisions of the city's noise ordinance, violations are punishable by up to 30

2

days in jail and fines of up to $500.

Michael Moshoures owns a venue called Sky Bar. After receiving several warnings for violating the amended ordinance, Moshoures sued the city and two of its officials in federal district court, arguing the restrictions on obscene, profane, and vulgar language violate the First Amendment.[1] On cross-motions for summary judgment, the district court concluded the obscene-language and vulgar-language provisions are constitutional because they both only restrict speech that is "obscene" as a constitutional matter and thus could be banned altogether. See *Miller v. California*, 413 U.S. 15, 23 (1973) ("[O]bscene material is unprotected by the First Amendment."). In contrast, the court concluded the profane-language provision violates the First Amendment and "enjoined . . . all enforcement of" it. JA 144.

Only Moshoures appeals. He does not challenge the district court's interpretation of the obscene-language provision or the court's conclusion that that provision is constitutional. Instead, Moshoures argues that the district court erred in reading the ordinance's vulgar-language provision as applying only to speech that is obscene as a constitutional matter (and thus already regulated by the obscene-language provision) and that, properly construed, the vulgar-language provision is also unconstitutional. Because the district court entered a final judgment, we have appellate jurisdiction under 28 U.S.C. § 1291.

---

[1] The district court later dismissed one of the individual defendants, and Moshoures did not appeal that ruling.

3

## II.

The reader may wonder why we are even here. True, the district court rejected Moshoures' constitutional challenge to the vulgar-language provision. But the court did so because it construed the vulgar-language provision as restricting *only* speech that is "obscene" both as a constitutional matter and as defined and restricted in the obscene-language provision whose constitutionality Moshoures no longer challenges. So why does it matter if the vulgar-language provision remains legally operative when the district court has construed that provision as covering only speech that is already prohibited by another provision that will remain in effect no matter what we say in this appeal?

It matters because the district court's construction of the vulgar-language provision—even if it is correct—is not binding on anyone. State courts, not federal courts, get "the last word about what state law means," *Grimmett v. Freeman*, 59 F.4th 689, 693 (4th Cir. 2023), and a federal district court's prediction about what a state statute means has no stare decisis effect on anyone, see, *e.g.*, *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741–42 (2011) (a district court's holdings are "not controlling authority in any jurisdiction" (quotation marks removed)); *Salve Regina Coll. v. Russell*, 499 U.S. 225, 239–40 (1991) (forbidding courts of appeals from deferring to district courts about the meaning of state law). Absent an injunction against the vulgar-language provision's enforcement, there is nothing to stop a city official from citing Moshoures for violating that provision by broadcasting music the city official thinks is statutorily vulgar but is not constitutionally obscene. And things may never get there if Moshoures decides to err on the side of discretion rather than valor and refrains from broadcasting any language that could be seen

4

as "vulgar" in a broader sense. See, *e.g.*, *Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (discussing First Amendment chill). That is why Moshoures wants a broader injunction than the one the district court gave him and why he is aggrieved in a legal sense by the court's order denying him one.

## III.

To decide whether the vulgar-language provision is constitutional, we must first decide what it means. See, *e.g.*, *United States v. Stevens*, 559 U.S. 460, 474 (2010). In doing so, we grant no deference to the district court's views and must exercise our own independent judgment. See *Salve Regina Coll.*, 499 U.S. at 239–40. Having done so, we conclude the vulgar-language provision restricts at least some speech that is not obscene in a constitutional sense (see Part III(A)), that it is appropriate for us to reach the First Amendment question (see Part III(B)), and that the vulgar-language provision is unconstitutional (see Part III(C)). We thus reverse the district court's judgment in part and remand for further proceedings.

## A.

Because our analysis will return several times to a few of the ordinance's provisions, we start by laying them out. While restricting noise generally, the ordinance creates special rules for "[t]he use of sound equipment to broadcast obscene, profane or vulgar language" from specified locations. JA 20. The ordinance also defines "obscene," "profane," and "vulgar." As defined by the ordinance:

> *Obscene* means description of sexual conduct that is objectionable or offensive to accepted standards of decency which the average person, applying North Myrtle Beach community standards would find, taken as a

5

whole, appeals to prurient interests or material which depicts or describes, in a patently offensive way, sexual conduct or genitalia specifically defined by S.C. Code Ann. § 16-15-305, which, taken as a whole, lacks serious literary, artistic, political, or scientific value.

\*      \*      \*

*Profane* means to treat with irreverence or contempt, crude, filthy, dirty, smutty, or indecent.

\*      \*      \*

*Vulgar* means making explicit and offensive reference to sex, male genitalia, female genitalia or bodily functions.

JA 18.

The district court concluded—and the parties do not dispute—that the ordinance's definition of obscene "directly mirrors the Supreme Court's definition of obscene material" for constitutional purposes in *Miller v. California*, 413 U.S. 15 (1973). JA 134. It is easy to see why. The same words appear over and over in both definitions, including "average person," "community standards," "taken as a whole," "prurient interest," "patently offensive way," and "lacks serious literary, artistic, political, or scientific value." Compare JA 18, with *Miller*, 413 U.S. at 24. We thus accept the premise that the ordinance's restrictions on broadcasting obscene language are a perfect match with the Supreme Court's constitutional definition of obscenity and thus cover all language that meets that constitutional definition and no language that does not.

That conclusion raises an immediate follow-up question: What does the ordinance's inclusion of the words "or vulgar" do? Like their sister courts around the country, South Carolina courts follow the canon against surplusage, which says "[a] statute should be so construed that no word, clause, sentence, provision or part shall be rendered surplusage, or

6

superfluous." *State v. Sweat*, 688 S.E.2d 569, 575 (S.C. 2010) (quotation marks removed). The district court's interpretation of "vulgar" violates this principle by reading an ordinance that restricts *X*, *Y*, and *Z* ("obscene, profane, or vulgar language") as meaning *X*, *Y*, and *X* (or at least *X*, *Y*, and some subset of *X*). See Defs. Br. 15 (asserting the district court did not hold "that 'obscene' and 'vulgar' mean the same thing" but that the ordinance's definition of "'vulgar' falls within" and is "narrower" than its definition of "obscene"). But the canon against surplusage instructs us to favor a construction that leaves *both* obscene and vulgar "with some independent operation." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 176 (2012).

The problems with the district court's interpretation only continue from there. For one thing, South Carolina also follows the plain-meaning rule under which courts "should give words their plain and ordinary meaning without resort to subtle or forced construction to limit or expand the statute's operation." *Sweat*, 688 S.E.2d at 575 (quotation marks removed). And, as the Supreme Court has recognized, the plain meaning of vulgar is different—and broader—than the constitutional meaning of obscene. See *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 191 (2021) ("[W]hile B. L. used vulgarity, her speech was not obscene as this Court has understood that term.").

More importantly, the words obscene and vulgar are both defined in the ordinance and those definitions are materially different. See *Lawson v. Suwannee Fruit & S.S. Co.*, 336 U.S. 198, 201 (1949) (stating that, at least "in the usual case," "[s]tatutory definitions control the meaning of statutory words"); 2A Norman Singer & Shambie Singer, *Sutherland Statutory Construction* § 47:7 (7th ed.) (Sutherland). In sharp contrast to its

7

definition of obscene, the ordinance's definition of vulgar uses none of the buzzwords associated with the canonical constitutional definition of obscenity, including "prurient interest," "patently offensive," or "community standards." The ordinance's definition of vulgar also is not limited to "sexual conduct specifically defined by the applicable state law," *Miller*, 413 U.S. at 24, and instead sweeps in any "explicit and offensive reference to sex, male genitalia, female genitalia or bodily functions." JA 18. But see *id.* (ordinance's definition of "obscene" limited to "sexual conduct or genitalia specifically described by S.C. Code Ann. § 16-15-305"). Finally, the ordinance's definition of vulgar also omits two critical constitutional limits that are present in its definition of obscene: that the work in question must be "taken as a whole" and that even the most disturbing or patently offensive speech is not obscene so long as it has "serious literary, artistic, political, or scientific value." *Miller*, 413 U.S. at 24. But see JA 18 (ordinance's definition of obscene requires that the relevant "description of sexual conduct" must be "taken as a whole" and "lack[ ] serious literary, artistic, political, or scientific value").

Two quick examples show why these differences matter. Older readers may be familiar with the Miami-based hip hop group 2 Live Crew, whose 1989 album *As Nasty as They Wanna Be* generated numerous threats of obscenity prosecutions. See, *e.g.*, *Luke Records, Inc. v. Navarro*, 960 F.2d 134, 135 (11th Cir. 1992) (per curiam). Any person who hears nearly any song on that album would likely agree that it "mak[es] explicit and offensive reference to sex, male genitalia, female genitalia or bodily functions" and thus falls squarely within the heartland of how this ordinance defines vulgar. JA 18. (The reader is welcome to take our word for it or use the magic of the internet to confirm or remind.)

8

Yet that same album was deemed not obscene in a constitutional sense because it had not been shown to lack "serious artistic value" and was thus constitutionally protected. *Luke Records*, 960 F.3d at 139. As we have explained, that same limitation is present in the ordinance's definition of obscene but absent from its definition of vulgar. See JA 18.

Or take an example that may be more familiar to younger readers: a series of bumper stickers that appear to depict the character Calvin (of the comic strip *Calvin & Hobbes*) engaged in what may euphemistically be called a "bodily function" on logos and other items. It appears clear these bumper stickers are not obscene in either a constitutional sense or as defined by the city's ordinance because they do not appeal to "prurient" interests or depict "sexual conduct." *Miller*, 413 U.S. at 24; JA 18; see also *Cohen v. California*, 403 U.S. 15, 20 (1971) ("Whatever else may be necessary to give rise to the States' . . . power to prohibit obscene expression, such expression must be, in some significant way, erotic."). But the ordinance's definition of vulgar contains neither limitation, and there is at least a plausible argument that the bumper stickers satisfy the ordinance's definition of "vulgar" by "making explicit and offensive reference to . . . bodily functions." JA 18.[2]

---

[2] We disagree with the defendants' suggestion that we could avoid this problem by reading the ordinance's reference to bodily functions as referring exclusively to "sexual bodily functions." Oral Arg. 33:00–34:41. Even if such an interpretation were defensible as a matter of statutory interpretation, it would not render the ordinance's definition of vulgar co-extensive with the constitutional definition of obscenity because "sex and obscenity are not synonymous." *Roth v. United States*, 354 U.S. 476, 487 (1957). We are also unpersuaded as a matter of statutory interpretation. This is not a situation where the challenged enactment contains a single term (A) followed by a list (B, C, and D) and the question is how far the first word travels down the list. See, *e.g.*, *Flores-Figueroa v. United States*, 556 U.S. 646, 647 (2009) (asking whether a statute that applies when a person "knowingly transfers, possesses, or uses, without lawful authority, a means of identification (Continued)

To be sure, South Carolina courts also apply "the doctrine of constitutional avoidance," which (broadly speaking) admonishes courts to favor interpretations that render legislative enactments constitutional over those that render them unconstitutional or constitutionally problematic. *Kirven v. Central States Health & Life Ins.*, 760 S.E.2d 794, 798 (S.C. 2014). But South Carolina's highest court has described constitutional avoidance as a "judicial default rule[]" that cannot override what is "expressly prescribed" by a statute's "terms"—even when reading a statute as meaning what it says renders the statute unconstitutional in at least some circumstances. *Id.* at 799; see also *id.* at 799–800 (holding that the statute at issue applied to the plaintiffs' claims but was unconstitutional as so applied).

That guidance applies here. To conclude the ordinance's use of vulgar captures only language that is constitutionally obscene, we would first need to ignore the fact that this ordinance is "written in the disjunctive" and restricts both obscene *and* vulgar speech. *FCC v. Pacifica Found.*, 438 U.S. 726, 740 (1978). But see *id.* at 739–40 (declining to read a statute restricting "obscene, indecent, or profane" material as covering only material that has "prurient appeal"). Having done so, we would further need to adopt a definition of

of another person" requires the defendant to know that the means of identification belonged to another person). True, the first item in the vulgar-language provision is "sex," and South Carolina courts follow the familiar rule that "the meaning of particular terms in a statute may be ascertained by reference to words associated with them in the statute." *Southern Mut. Church Ins. Co. v. South Carolina Windstorm & Hail Underwriting Ass'n*, 412 S.E.2d 377, 379 (S.C. 1991). But the vulgar-language provision also includes the words "male genitalia" and "female genitalia," and it requires no deep knowledge of American slang to conjure examples of "explicit and offensive reference[s]" to each of those categories that do not refer to sex. JA 18.

10

vulgar that is inconsistent with the word's ordinary meaning and reads into the ordinance's definition of vulgar limiting language that is present in the definition of obscene but absent from the definition of vulgar. But see Sutherland § 47.38 ("[W]hen the legislature uses a term or phrase in one statute or provision but excludes it from another, courts do not imply an intent to include the missing term in that statute or provision where the term or phrase is excluded."). That would be some aggressive statutory interpretation indeed. [3]

Federal courts "must be careful not to encroach upon the domain of" state lawmakers "by rewriting a law to conform it to constitutional requirements" and are thus "without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent." *Toghill v. Clarke*, 877 F.3d 547, 556 (4th Cir. 2017) (alterations and quotation marks removed). For the reasons just explained, "we think it unlikely" that South Carolina's highest court "would read" the ordinance the way the district court did. *Grimmett*, 59 F.4th at 693. We thus conclude the vulgar-language provision reaches at least some speech that is not obscene in a constitutional sense.

## B.

We could—and normally would—stop there. "[W]e are a court of review, not of first view," *Grimmett*, 59 F.4th at 696 (quotation marks removed), and the district court

---

[3] Of course, South Carolina's highest court could adopt any construction of this ordinance it liked and federal courts (and everyone else) would be bound by that holding. See *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 n.11 (1988). But no party has requested that we certify this question to the Supreme Court of South Carolina, and "a federal litigant" need not "await a state-court construction . . . before bringing [a] federal suit." *Id.*

11

never considered whether the vulgar-language provision would be constitutional if it covered language that is not obscene in a constitutional sense. Our "ordinary" practice would thus be to vacate the district court's judgment and remand without saying more. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 913 (2014).

We choose a different path here for three reasons. First, the parties have fully briefed the constitutional issues and neither side asks us to remand so that the district court can consider them in the first instance. Second, no party suggests that more facts are necessary to answer the constitutional question or that it cannot be decided on summary judgment, and the district court's ultimate determination about whether the ordinance—properly construed—is constitutional would be reviewed de novo. See *Grimmett*, 59 F.4th at 692; cf. *B.P.J. v. West Va. State Bd. of Educ.*, 98 F.4th 542, 562 (4th Cir. 2024) (noting that appellate courts "rarely" resolve in the first instance issues that would be reviewed for abuse of discretion). Third, the district court conducted an extensive analysis of the profane-language provision's constitutionality, and the defendants have offered no explanations for why the vulgar-language provision is constitutional that they did not offer in support of the profane-language provision. We thus exercise our discretion to consider the constitutional issues now. Accord *Reed v. Town of Gilbert*, 576 U.S. 155, 162–73 (2015) (conducting new First Amendment analysis when reviewing a decision that granted the defendant town's motion for summary judgment based on a later-rejected legal theory).

C.

The First and Fourteenth Amendments prohibit the city and its officials from "abridging the freedom of speech." U.S. Const. amend. I; see *Reed*, 576 U.S. at 163.

12

Although First Amendment doctrine can be intricate, one of its most basic rules is that "[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. We conclude the vulgar-language provision triggers and fails that level of strict constitutional scrutiny.

*First*, the vulgar-language provision is content-based. That provision is not a generally applicable noise ordinance. Instead, it imposes strict limits on "[t]he use of sound equipment" based solely on the type of "language" being broadcast. JA 20. If Moshoures were content to play only instrumental music that one might hear in an ice cream shop or inoffensive pop songs like Vanessa Carlton's *A Thousand Miles*, the vulgar-language provision would have no application to him. But because he wants to play music that some might consider less wholesome, he must keep it (way) down or risk fines or imprisonment. "That is textbook content discrimination." *Grimmett*, 59 F.4th at 694.

Like the district court, we reject the defendants' claim that the ordinance is not content-based because it rests on justifications that are content-neutral. To quote the Supreme Court: "Although a content-based purpose may be sufficient in certain circumstances to show that a regulation is content based, it is not necessary. In other words, an innocuous justification cannot transform a facially content-based law into one that is content neutral." *Reed*, 576 U.S. at 165–66 (quotation marks removed); see *Lucero v. Early*, 873 F.3d 466, 479 (4th Cir. 2017) (same). The vulgar-language provision is facially content-based, and the defendants' proffered content-neutral justifications do nothing to

13

change that fact.

*Second*, the vulgar-language provision reaches at least some "constitutionally protected" speech. *Lewis v. City of New Orleans*, 415 U.S. 130, 134 (1974). The First Amendment "permit[s] restrictions on the content of speech in a few limited areas." *Stevens*, 559 U.S. at 468 (quotation marks removed). One such category is "obscene" speech, which is "fully outside the protection of the First Amendment," *id.* at 471, and thus may be regulated by laws that single out obscene speech for disfavored treatment. But as we have explained, the vulgar-language provision reaches past the constitutional definition of obscenity and grabs hold of some speech that is simply, well, vulgar. And speech that is "vulgar or offensive"—but not obscene—"is protected by the First and Fourteenth Amendments." *Lewis*, 415 U.S. at 134.

The defendants insist that even if the vulgar-language provision reaches some non-obscene speech, it still does not trigger strict scrutiny because it is not "substantially overbroad." *City of Houston v. Hill*, 482 U.S. 451, 458 (1987). Whatever the merits of that argument generally, it does not help the defendants here. But see *Reed*, 576 U.S. at 163–73 (holding that a content-based sign ordinance triggered and failed strict scrutiny without asking whether the statute was substantially overbroad). Because the obscene-language provision also exists, the only independent function of the vulgar-language provision is to criminalize speech that is not obscene and thus cannot be prohibited. See *Stevens*, 559 U.S. at 473 (stating that an overbreadth analysis involves comparing the number of a law's unconstitutional applications to that same law's "plainly legitimate sweep" (quotation marks removed)). What is more, the defendants' brief identifies "no examples" of the

vulgar-language provision's "legitimate applications" beyond duplicating the work of the obscene-language provision. *Grimmett*, 59 F.4th at 694 (quotation marks removed). We thus hold that the vulgar-language provision triggers strict constitutional scrutiny.

*Third*, the vulgar-language provision fails strict scrutiny. The defendants identify various interests served by that provision, including "the protection of children and of captive audiences and unwilling listeners, as well as the protection and preservation of the City's neighborhoods." Defs. Br. 18. Those are all legitimate interests, and, like the district court, we assume for purposes of our analysis that at least some of them can sometimes be compelling. We nonetheless conclude that the vulgar-language provision cannot survive strict scrutiny because it is not "narrowly tailored to serve" the interests the defendants identify here. *Reed*, 576 U.S. at 163.

To begin, the vulgar-language provision suffers from the same over-inclusiveness problem that the district court identified with the profane-language provision. See *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 805 (2011) (laws that "affect First Amendment rights" must pursue even "legitimate" ends "by means that are neither seriously underinclusive nor seriously overinclusive"). As the district court explained, the vulgar-language provision "necessarily interfere[s] with Moshoures' First Amendment freedom to broadcast [vulgar] language which may be heard by adults," including those who "consent" to hearing such language "outside of Sky Bar." JA 141. Cf. *Cohen*, 403 U.S. at 25 ("one [person's] vulgarity is another's lyric").

The vulgar-language provision is also "wildly underinclusive" with respect to the city's asserted aims. *Brown*, 564 U.S. at 802. Most obviously, if the goal is to "protect[ ]

15

and preserv[e]" the city's neighborhoods from excessive noise, Defs. Br. 18, there is no need for a content-specific ordinance at all, much less one that requires certain categories of disfavored speech to be played at much lower volumes than all others. Because the city has "ample content-neutral options available to resolve" this problem, its content-based approach fails strict scrutiny. *Reed*, 576 U.S. at 173.

The city's avowed interest in protecting children fares no better. On this record, we cannot say how many of the children the city seeks to shield from hearing vulgar music in public places "have parents who *care* whether they" hear it, so the vulgar-language provision may well be overinclusive as to those "young people whose" caretakers think such music is "a harmless pastime" or even has affirmative value. *Brown*, 564 U.S. at 804–05; see also *id.* at 802 (expressing "doubts that punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech is a proper governmental means of aiding parental authority"). And the defendants' suggestion that the city may limit speech in public spaces "to only what is fit for children" is unavailing. *Reno v. ACLU*, 521 U.S. 844, 875 (1997) (alterations and quotation marks removed); see *Cohen*, 403 U.S. at 21 (rejecting the argument that California could make it a crime to wear a jacket with the words "Fuck the Draft" in public to protect "unwilling or unsuspecting viewers"); *Butler v. Michigan*, 352 U.S. 380, 382–83 (1957) (government may not "quarantin[e] the general reading public against books not too rugged for grown men and women in order to shield juvenile innocence").

\* \* \*

Like the problems of excessive or ugly signage involved in *Reed*, policymakers have

16

ample tools to deal with loud and offensive speech in public spaces. Speech that is not protected by the First Amendment may be prohibited outright—including obscenity, defamation, incitement, and "speech integral to criminal conduct." *Stevens*, 559 U.S. at 468. Policymakers may also impose generally applicable time, place, and manner restrictions—including limits on the use of amplified sound, see, *e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781 (1989)—without triggering strict scrutiny so long as they do so "in an evenhanded, content-neutral manner." *Reed*, 576 U.S. at 173.[4] What the city may not do is single out a subset of constitutionally protected speech for special disfavored treatment in public spaces because some (or even most) citizens would prefer not to hear it. See *Pacifica Found.*, 438 U.S. at 745 ("[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it.").

The judgment is reversed in part, and the case is remanded for further proceedings consistent with this opinion.

*SO ORDERED*

---

[4] Indeed, one of the main decisions on which the defendants have relied—*Kovacs v. Cooper*, 336 U.S. 77 (1949)—is "the classic time, place, and manner case." *Rosen v. Port of Portland*, 641 F.2d 1243, 1250 (9th Cir. 1981) (quotation marks removed). The ordinance involved in *Kovacs* barred use of amplified sound on any vehicle on any public street regardless of the content of what was being broadcast. See 336 U.S. at 78 (quoting ordinance).