Justice Auto,
with whom The Chief Justice joins,
concurring in the judgment.
The California statute that is before us in this case represents a pioneering effort to address what the state legislature and others regard as a potentially serious social problem: the effect of exceptionally violent video games on impressionable minors, who often spend countless hours immersed in the alternative worlds that these games create. Although the California statute is well intentioned, its terms are not framed with the precision that the Constitution demands, and I therefore agree with the Court that this particular law cannot be sustained.
*806 I disagree, however, with the approach taken in the Court’s opinion. In considering the application of unchanging constitutional principles to new and rapidly evolving technology, this Court should proceed with caution. We should make every effort to understand the new technology. We should take into account the possibility that developing technology may have important societal implications that will become apparent only with time. We should not jump to the conclusion that new technology is fundamentally the same as some older thing with which we are familiar. And we should not hastily dismiss the judgment of legislators, who may be in a better position than we are to assess the implications of new technology. The opinion of the Court exhibits none of this caution.
In the view of the Court, all those concerned about the effects of violent video games — federal and state, legislators, educators, social scientists, and parents — are unduly fearful, for violent video games really present no serious problem. See ante, at 798-801, 803-804. Spending hour upon hour controlling the actions of a character who guns down scores of innocent victims is not different in “kind” from reading a description of violence in a work of literature. See ante, at 798.
The Court is sure of this; I am not. There are reasons to suspect that the experience of playing violent video games just might be very different from reading a book, listening to the radio, or watching a movie or a television show.
I
Respondents in this case, representing the video-game industry, ask us to strike down the California law on two grounds: the broad ground adopted by the Court and the narrower ground that the law’s definition of “violent video game,” see Cal. Civ. Code Ann. § 1746(d)(1)(A) (West 2009), is impermissibly vague. See Brief for Respondents 23-61. Because I agree with the latter argument, I see no need to *807 reach the broader First Amendment issues addressed by the Court.[1]
A
. Due process requires that laws give people of ordinary intelligence fair notice of what is prohibited. Grayned v. City of Rockford, 408 U. S. 104, 108 (1972). The lack of such notice in a law that regulates expression “raises special First Amendment concerns because of its obvious chilling effect on free speech.” Reno v. American Civil Liberties Union, 521 U. S. 844, 871-872 (1997). Vague laws force potential speakers to “ 'steer far wider of the unlawful zone’... than if the boundaries of the forbidden areas were clearly marked.” Baggett v. Bullitt, 377 U. S. 360, 372 (1964) (quoting Speiser v. Randall, 357 U. S. 513, 526 (1958)). While “perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity,” Ward v. Rock Against Racism, 491 U. S. 781, 794 (1989), “government may regulate in the area” of First Amendment freedoms “only with narrow specificity,” NAACP v. Button, 371 U. S. 415, 433 (1963); see also Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U. S. 489, 499 (1982). These principles apply to laws that regulate expression for the purpose of protecting children. See Interstate Circuit, Inc. v. Dallas, 390 U. S. 676, 689 (1968).
Here, the California law does not define “violent video games” with the “narrow specificity” that the Constitution demands. In an effort to avoid First Amendment problems, the California Legislature modeled its violent video game statute on the New York law that this Court upheld in Ginsberg v. New York, 390 U. S. 629 (1968) — a law that prohibited the sale of certain sexually related materials to minors, see id., at 631-633. But the California Legislature departed *808 from the Ginsberg model in an important respect, and the legislature overlooked important differences between the materials falling within the scope of the two statutes.
B
The law at issue in Ginsberg prohibited the sale to minors of materials that were deemed “harmful to minors,” and the law defined “harmful to minors” simply by adding the words “for minors” to each element of the definition of obscenity set out in what were then the Court’s leading obscenity decisions, see Roth v. United States, 354 U. S. 476 (1957), and Book Named “John Cleland’s Memoirs of a Woman of Pleasure” v. Attorney General of Mass., 383 U. S. 413 (1966).
Seeking to bring its violent video game law within the protection of Ginsberg, the California Legislature began with the obscenity test adopted in Miller v. California, 413 U. S. 15 (1973), a decision that revised the obscenity tests previously set out in Roth and Memoirs. The legislature then made certain modifications to accommodate the aim of the violent video game law.
Under Miller, an obscenity statute must contain a threshold limitation that restricts the statute’s scope to specifically described “hard core” materials. See 413 U. S., at 23-25, 27. Materials that fall within this “hard core” category may be deemed to be obscene if three additional requirements are met:
(1) An “average person, applying contemporary community standards [must] find ... the work, taken as a whole, appeals to the prurient interest”;
(2) “the work [must] depic[t] or describ[e], in a patently offensive way, sexual conduct specifically defined by the applicable state law; and”
(3) “the work, taken as a whole, [must] lac[k] serious literary, artistic, political, or scientific value.” Id., at 24 (internal quotation marks omitted).
*809 Adapting these standards, the California law imposes the following threshold limitation: “[T]he range of options available to a player [must] includ[e] killing, maiming, dismembering, or sexually assaulting an image of a human being.” § 1746(d)(1). Any video game that meets this threshold test is subject to the law’s restrictions if it also satisfies three further requirements:
“(i) A reasonable person, considering the game as a whole, would find [the game] appeals to a deviant or morbid interest of minors.
“(ii) It is patently offensive to prevailing standards in the community as to what is suitable for minors.
“(iii) It causes the game, as a whole, to lack serious literary, artistic, political, or scientific value for minors.” § 1746(d)(1)(A).[2]
C
The first important difference between the Ginsberg law and the California violent video game statute concerns their respective threshold requirements. As noted, the Ginsberg law built upon the test for adult obscenity, and the current adult obscenity test, which was set out in Miller, requires an obscenity statute to contain a threshold limitation that restricts the statute’s coverage to specifically defined “hard core” depictions. See 413 U. S., at 23-25, 27. The Miller Court gave as an example a statute that applies to only “[p]atently offensive representations or descriptions of ultimate sexual acts,” “masturbation, excretory functions, and *810 lewd exhibition of the genitals.” Id., at 25. The Miller Court clearly viewed this threshold limitation as serving a vital notice function. “We are satisfied,” the Court wrote, “that these specific prerequisites will provide fair notice to a dealer in such materials that his public and commercial activities may bring prosecution.” Id., at 27; see also Reno, 521 U. S., at 873 (observing that Miller’s threshold limitation “reduces the vagueness inherent in the open-ended term 'patently offensive’ ”).[3]
By contrast, the threshold requirement of the California law does not perform the narrowing function served by the limitation in Miller. At least when Miller was decided, depictions of “hard core” sexual conduct were not a common feature of mainstream entertainment. But nothing similar can be said about much of the conduct covered by the California law. It provides that a video game cannot qualify as “violent” unless “the range of options available to a player includes killing, maiming, dismembering, or sexually assaulting an image of a human being.” § 1746(d)(1).
For better or worse, our society has long regarded many depictions of killing and maiming[4] as suitable features of popular entertainment, including entertainment that is widely available to minors. The California law’s threshold requirement would more closely resemble the limitation in Miller if it targeted a narrower class of graphic depictions.
Because of this feature of the California law’s threshold test, the work of providing fair notice is left in large part to *811 the three requirements that follow, but those elements are also not up to the task. In drafting the violent video game law, the California Legislature could have made its own judgment regarding the kind and degree of violence that is acceptable in games played by minors (or by minors in particular age groups). Instead, the legislature relied on undefined societal or community standards.
One of the three elements at issue here refers expressly to “prevailing standards in the community as to what is suitable for minors.” § 1746(d)(1)(A)(ii). Another element points in the same direction, asking whether “[a] reasonable person, considering [a] game as a whole,” would find that it “appeals to a deviant or morbid interest of minors.” § 1746(d)(1)(A)(i) (emphasis added).
The terms “deviant” and “morbid” are not defined in the statute, and California offers no reason to think that its courts would give the terms anything other than their ordinary meaning. See Reply Brief for Petitioners 5 (arguing that “[a] reasonable person can make this judgment through ... a common understanding and definition of the applicable terms”). I therefore assume that “deviant” and “morbid” carry the meaning that they convey in ordinary speech. The adjective “deviant” ordinarily means “deviating . . . from some accepted norm,” and the term “morbid” means “of, relating to, or characteristic of disease.” Webster’s 618, 1469. A “deviant or morbid interest” in violence, therefore, appears to be an interest that deviates from what is regarded— presumably in accordance with some generally accepted standard — as normal and healthy. Thus, the application of the California law is heavily dependent on the identification of generally accepted standards regarding the suitability of violent entertainment for minors.
The California Legislature seems to have assumed that these standards are sufficiently well known so that a person of ordinary intelligence would have fair notice as to whether the kind and degree of violence in a particular game is *812 enough to qualify the game as “violent.” And because the Miller test looks to community standards, the legislature may have thought that the use of undefined community standards in the violent video game law would not present vagueness problems.
There is a critical difference, however, between obscenity laws and laws regulating violence in entertainment. By the time of this Court’s landmark obscenity cases in the 1960’s, obscenity had long been prohibited, see Roth, 354 U. S., at 484-485, and this experience had helped to shape certain generally accepted norms concerning expression related to sex.
There is no similar history regarding expression related to violence. As the Court notes, classic literature contains descriptions of great violence, and even children’s stories sometimes depict very violent scenes. See ante, at 795-797.
Although our society does not generally regard all depictions of violence as suitable for children or adolescents, the prevalence of violent depictions in children’s literature and entertainment creates numerous opportunities for reasonable people to disagree about which depictions may excite “deviant” or “morbid” impulses. See Edwards & Berman, Regulating Violence on Television, 89 Nw. U. L. Rev. 1487, 1523 (1995) (observing that the Miller test would be difficult to apply to violent expression because “there is nothing even approaching a consensus on low-value violence”).
Finally, the difficulty of ascertaining the community standards incorporated into the California law is compounded by the legislature’s decision to lump all minors together. The California law draws no distinction between young children and adolescents who are nearing the age of majority.
In response to a question at oral argument, the attorney defending the constitutionality of the California law said that the State would accept a narrowing construction of the law under which the law’s references to “minors” would be interpreted to refer to the oldest minors — that is, those just short *813 of 18. Tr. of Oral Arg. 11-12. However, “it is not within our power to construe and narrow state laws.” Grayned, 408 U. S., at 110. We can only “ ‘extrapolate [their] allowable meaning’” from the statutory text and authoritative interpretations of similar laws' by courts of the State. Ibid. (quoting Garner v. Louisiana, 368 U. S. 157, 174 (1961) (Frankfurter, J., concurring in judgment)).
In this case, California has not provided any evidence that the California Legislature intended the law to be limited in this way, or cited any decisions from its courts that would support an “oldest minors” construction.[5]
For these reasons, I conclude that the California violent video game law fails to provide the fair notice that the Constitution requires. And I would go no further. I would not express any view on whether a properly drawn statute would or would not survive First Amendment scrutiny. We should address that question only if and when it is necessary to do so.
II
Having outlined how I would decide this case, I will now briefly elaborate on my reasons for questioning the wisdom of the Court’s approach. Some of these reasons are touched upon by the dissents, and while I am not prepared at this time to go as far as either Justice Thomas or Justice Breyer, they raise valid concerns.
A
The Court is wrong in saying that the holding in United States v. Stevens, 559 U. S. 460 (2010), “controls this case.” Ante, at 792. First, the statute in Stevens differed sharply *814 from the statute at issue here. Stevens struck down a law that broadly prohibited any person from creating, selling, or possessing depictions of animal cruelty for commercial gain. The California law involved here, by contrast, is limited to the sale or rental of violent video games to minors. The California law imposes no restriction on the creation of violent video games, or on the possession of such games by anyone, whether above or below the age of 18. The California law does not regulate the sale or rental of violent games by adults. And the California law does not prevent parents and certain other close relatives from buying or renting violent games for their children or other young relatives if they see fit.
Second, Stevens does not support the proposition that a law like the one at issue must satisfy strict scrutiny. The portion of Stevens on which the Court relies rejected the Government’s contention that depictions of animal cruelty were categorically outside the range of any First Amendment protection. 559 U. S., at 471-472. Going well beyond Stevens, the Court now holds that any law that attempts to prevent minors from purchasing violent video games must satisfy strict scrutiny instead of the more lenient standard applied in Ginsberg, 390 U. S. 629, our most closely related precedent. As a result of today’s decision, a State may prohibit the sale to minors of what Ginsberg described as “girlie magazines,” but a State must surmount a formidable (and perhaps insurmountable) obstacle if it wishes to prevent children from purchasing the most violent and depraved video games imaginable.
Third, Stevens expressly left open the possibility that a more narrowly drawn statute targeting depictions of animal cruelty might be compatible with the First Amendment. See 559 U. S., at 482. In this case, the Court’s sweeping opinion will likely be read by many, both inside and outside the video-game industry, as suggesting that no regulation of minors’ access to violent video games is allowed — at least *815 without supporting evidence that may not be realistically obtainable given the nature of the phenomenon in question.
B
The Court’s opinion distorts the effect of the California law. I certainly agree with the Court that the government has no “free-floating power to restrict the ideas to which children may be exposed,” ante, at 794-795, but the California law does not exercise such a power. If parents want their child to have a violent video game, the California law does not interfere with that parental prerogative. Instead, the California law reinforces parental decisionmaking in exactly the same way as the New York statute upheld in Ginsberg. Under both laws, minors are prevented from purchasing certain materials; and under both laws, parents are free to supply their children with these items if that is their wish.
Citing the video-game industry’s voluntary rating system, the Court argues that the California law does not “meet a substantial need of parents who wish to restrict their children’s access to violent video games but cannot do so.” Ante, at 803. The Court does not mention the fact that the industry adopted this system in response to the threat of federal regulation, Brief for Activision Blizzard, Inc., as Amicus Curiae 7-10, a threat that the Court’s opinion may now be seen as largely eliminating. Nor does the Court acknowledge that compliance with this system at the time of the enactment of the California law left much to be desired[6] — or that future enforcement may decline if the video- *816 game industry perceives that any threat of government regulation has vanished. Nor does the Court note, as Justice Breyer points out, see post, at 849-850 (dissenting opinion), that many parents today are simply not able to monitor their children's use of computers and gaming devices.
C
Finally, the Court is far too quick to dismiss the possibility that the experience of playing video games (and the effects on minors of playing violent video games) may be very different from anything that we have seen before. Any assessment of the experience of playing video games must take into account certain characteristics of the video games that are now on the market and those that are likely to be available in the near future.
Today's most advanced video games create realistic alternative worlds in which millions of players immerse themselves for hours on end. These games feature visual imagery and sounds that are strikingly realistic, and in the near future video-game graphics may be virtually indistinguishable from actual video footage.[7] Many of the games already on the market can produce high definition images,[8] and it is predicted that it will not be long before video-game images will be seen in three dimensions.[9] It is also forecast that *817 video games will soon provide sensory feedback.[10] By wearing a special vest or other device, a player will be able to experience physical sensations supposedly felt by a character on the screen.[11] Some amici who support respondents foresee the day when “ ‘virtual-reality shoot-'em-ups’ ” will allow children to “‘actually feel the splatting blood from the blown-off head’ ” of a victim. Brief for Reporters Committee for Freedom of the Press et al. as Amici Curiae 29 (quoting H. Schechter, Savage Pastimes 18 (2005)).
Persons who play video games also have an unprecedented ability to participate in the events that take place in the virtual worlds that these games create. Players can create their own video-game characters and can use photos to produce characters that closely resemble actual people. A person playing a sophisticated game can make a multitude of choices and can thereby alter the course of the action in the game. In addition, the means by which players control the action in video games now bear a closer relationship to the means by which people control action in the real world. While the action in older games was often directed with buttons or a joystick, players dictate the action in newer games by engaging in the same motions that they desire a character *818 in the game to perform.[12] For example, a player who wants a video-game character to swing a baseball bat — either to hit a ball or smash a skull — could bring that about by simulating the motion of actually swinging a bat.
These present-day and emerging characteristics of video games must be considered together with characteristics of the violent games that have already been marketed.
In some of these games, the violence is astounding.[13] Victims by the dozens are killed with every imaginable implement, including machineguns, shotguns, clubs, hammers, axes, swords, and chainsaws. Victims are dismembered, decapitated, disemboweled, set on fire, and chopped into little pieces. They cry out in agony and beg for mercy. Blood gushes, splatters, and pools. Severed body parts and gobs of human remains are graphically shown. In some games, points are awarded based, not only on the number of victims killed, but on the killing technique employed.
It also appears that there is no antisocial theme too base for some in the video-game industry to exploit. There are games in which a player can take on the identity and reenact the killings carried out by the perpetrators of the murders at Columbine High School and Virginia Tech.[14] The objec *819 tive of one game is to rape a mother and her daughters;[15] in another, the goal is to rape Native American women.[16] There is a game in which players engage in “ethnic cleansing” and can choose to gun down African-Americans, Latinos, or Jews.[17] In still ahother game, players attempt to fire a rifle shot into the head of President Kennedy as his motorcade passes by the Texas School Book Depository.[18]
If the technological characteristics of the sophisticated games that are likely to be available in the near future are combined with the characteristics of the most violent games already marketed, the result will be games that allow troubled teens to experience in an extraordinarily personal and vivid way what it would be like to carry out unspeakable acts of violence.
The Court is untroubled by this possibility. According to the Court, the “interactive” nature of video games is “nothing new” because “all literature is interactive.” Ante, at 798. Disagreeing with this assessment, the International Game Developers Association (IGDA) — a group that presumably understands the nature of video games and that supports respondents — tells us that video games are “far more concretely interactive.” Brief for IGDA et al. as Amici Curiae 3. And on this point, the game developers are surely correct.
*820 It is certainly true, as the Court notes, that “ ‘[literature when it is successful draws the reader into the story, makes him identify with the characters, invites him to judge them and quarrel with them, to experience their joys and sufferings as the reader’s own.’ ” Ante, at 798 (quoting American Amusement Machine Assn. v. Kendrick, 244 F. 3d 572, 577 (CA7 2001)). But only an extraordinarily imaginative . reader who reads a description of a killing in a literary work will experience that event as vividly as he might if he played the role of the killer in a video game. To take an example, think of a person who reads the passage in Crime and Punishment in which Raskolnikov kills the old pawnbroker with an ax. See F. Dostoyevsky, Crime and Punishment 78 (Modern Library ed. 1950). Compare that reader with a video-game player who creates an avatar that bears his own image; who sees a realistic image of the victim and the scene of the killing in high definition and in three dimensions; who is forced to decide whether or not to kill the victim and decides to do so; who then pretends to grasp an ax, to raise it above the head of the victim, and then to bring it down; who hears the thud of the ax hitting her head and her cry of pain; who sees her split skull and feels the sensation of blood on his face and hands. For most people, the two experiences will not be the same.[19]
When all of the characteristics of video games are taken into account, there is certainly a reasonable basis for thinking that the experience of playing a video game may be quite different from the experience of reading a book, listening to a radio broadcast, or viewing a movie. And if this is so, *821 then for at least some minors, the effects of playing violent video games may also be quite different. The Court acts prematurely in dismissing this possibility out of hand.
* * *
For all these reasons, I would hold only that the particular law at issue here fails to provide the clear notice that the Constitution requires. I would not squelch legislative efforts to deal with what is perceived by some to be a significant and developing social problem. If differently framed statutes are enacted by the States or by the Federal Government, we can consider the constitutionality of those laws when cases challenging them are presented to us.

 It is well established that a judgment may be affirmed on an alternative ground that was properly raised but not addressed by the lowor court. Washington v. Confederated Bands and Tribes of Yakima Nation, 439 U. S. 463, 476-478, n. 20 (1979).

 Under the California law, a game that meets the threshold requirement set out in text also qualifies as “violent” if it “[e]nables the player to virtually inflict serious injury upon images of human beings or characters with substantially human characteristics in a manner which is especially heinous, cruel, or depraved in that it involves torture or serious physical abuse to the victim.” § 1746(d)(1)(B). In the Court of Appeals, California conceded that this alternative definition is unconstitutional, Video Software Dealers Assn. v. Schwarzenegger, 556 F. 3d 950, 954, n. 5 (CA9 2009), and therefore only the requirements set out in text are now before us.

 The provision of New York law under which the petitioner was convicted in Ginsberg v. New York, 390 U. S. 629 (1968), was framed with similar specificity. This provision applied to depictions of “nudity” and “sexual conduct,” and both those terms were specifically and unambiguously defined. See id., at 645-647 (Appendix A to opinion of the Court).

 The California law does not define the term “maiming,” nor has the State cited any decisions from its courts that define the term in this context. Accordingly, I take the term to have its ordinary meaning, which includes the infliction of any serious wound, see Webster’s Third New International Dictionary 1362 (2002) (hereinafter Webster’s).

 At oral argument, California also proposed that the term “minors” could be interpreted as referring to the “typical age group of minors” who play video games. Tr. of Oral Arg. 11. But nothing in the law’s text supports such a limitation. Nor has California cited any decisions indicating that its courts would restrict the law in this way. And there is nothing in the record indicating what this age group might be.

 A 2004 Federal Trade Commission Report showed that 69 percent of unaccompanied children ages 13 to 16 were able to buy M-rated games and that 56 percent of 13-year-olds were able to buy an M-rated game. Marketing Violent Entertainment to Children: A Fourth Follow-Up Review of Industry Practices in the Motion Picture, Music Recording & Electronic Game Industries 26-28 (July 2004), http://www.ftc.gov/os/2004/07/ 040708kidsvioleneerpt.pdf (all Internet materials as visited June 24, 2011, and available in Clerk of Court’s ease file).

 See Chayka, Visual Games: Photorealism in Crisis, Kill Screen (May 2011), http://killscreendaily.con3/artieles/visual-games-photorealism-crisis.

 To see brief video excerpts from games with highly realistic graphics, see Spike TV Video Game Awards 2010 — Game of the Year Nominees, GameTrailers.com (Dec. 10, 2010), http://www.gametrailers.com/video/ game-of-spike-tv-vga/707755?type=flv.

 See Selleck, Sony PSS Launching 50 3D-Capable Video Games in the Near Future, SlashGear (Nov. 23, 2010), http://www.slashgear.com/ sony-ps3-launching-50-3d-eapable-video-games-in-the-near-future-23115866; Sofge, Why 3D Doesn’t Work for TV, But Is Great for Gaming, Popular Mechanics (Mar. 11, 2010), http://www.popularmechanies.com/teehnology/ digital/gaming/4342437.

 T. Chatfield, Fun Inc.: Why Games Axe the Twenty-first Century's Most Serious Business 211 (2010) (predicting that “[w]e can expect . . . physical feedback and motion detection as standard in every gaming device in the near future”); J. Blascovich & J. Bailenson, Infinite Reality: Avatars, Eternal Life, New Worlds, and the Dawn of the Virtual Revolution 2 (2011) (“Technological developments powering virtual worlds are accelerating, ensuring that virtual experiences will become more immer-sive by providing sensory information that makes people feel they are ‘inside’ virtual worlds” (emphasis in the original)).

 See Topolsky, The Mindwire V5 Turns Gaming Into Pure Electroshock Torture, Engadget (Mar. 9, 2008), http://www.engadget.com/2008/08/09/ the-mindwire-v5-turns-gaming-into-pure-eleetroshock-torture; Greenemeier, Video Game Vest Simulates Sensation of Being Capped, Scientific American (Oct. 25, 2007), http://www.scientificamerican.com/article.efm?id= video-game-vest-simulates.

 See Schiesel, A Real Threat Now Faces the Nintendo Wii, N. Y. Times, Dec. 3, 2010, p. F7 (describing how leading developers of video-game consoles are competing to deliver gesture-controlled gaming devices).

 For a sample of violent video games, see Wilson, The 10 Most Violent Video Games of All Time, PCMag.com (Feb. 10, 2011), http:// www.pcmag.com/article2/0,2817,2379959,OO.asp. To see brief video excerpts from violent games, see Chomik, Top 10: Most Violent Video Games, AskMen.com, http://www.askmen.com/top_10/videogame/top-10-most-violent-video-games.html; Sayed, 15 Most Violent Video Games That Made You Puke, Gamingbolt (May 2, 2010), http://gamingbolt.com/ 15-most-violent-video-games-that-made-you-puke.

 Webley, “School Shooter” Video Game To Reenact Columbine, Virginia Tech Killings, Time (Apr. 20, 2011), http://newsfeed.time.com/2011/04/20/ sehool-shooter-video-game-reenaets-columbine-virginia-tech-killings. After a Web site that made School Shooter available for download re *819 moved it in response to mounting criticism, the developer stated that it may make the game available on its own Web site. Inside the Sick Site of a School Shooter Mod (Mar. 26, 2011), http://ssnat.com.

 Lah, “RapeLay” Video Game Goes Viral Amid Outrage, CNN (Mar. 30, 2010), http://articles.cnn.com/2010-03-30/world/japanwideo. game.rape_l_game-teenage-girl-japanese-government?_s=PM:WORLD.

 Graham, Custer May Be Shot Down Again in a Battle of the Sexes Over X-Rated Video Games, People, Nov. 15, 1982, pp. 110, 115.

 Scheeres, Games Elevate Hate to Next Level, Wired (Feb. 20, 2002), http://www.wired.com/print/culture/lifestyle/news/2002/02/50523.

 Thompson, A View to a Kill: JFK Reloaded Is Just Plain Creepy, Slate (Nov. 22, 2004), http://www.slate.com/id/2110034.

 As the Court notes, there are a few children’s books that ask young readers to step into the ohooo of a character and to malee choices that take the stories along one of a very limited number of possible lines. See ante, at 798. But the very nature of the print medium makes it impossible for a book to offor anything like the same number of choices as those provided by a video game.