[Cite as *State v. Gore*, 2026-Ohio-1488.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
COLUMBIANA COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

DEAN DOMINIQUE GORE,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 25 CO 0020

---

Criminal Appeal from the
Columbiana County Municipal Court of Columbiana County, Ohio
Case No. 2024 CR B 000640

**BEFORE:**
Cheryl L. Waite, Carol Ann Robb, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Vito J. Abruzzino,* Columbiana County Prosecutor, and *Atty. Jennifer Bonish,* Assistant Prosecutor, for Plaintiff-Appellee

*Atty. Ronald D. Yarwood*, DeGenova & Yarwood, Ltd., for Defendant-Appellant

Dated:  April 24, 2026

**WAITE, P.J.**

**{¶1}** Appellant Dean Dominique Gore appeals the February 6, 2025 judgment entry of the Columbiana County Municipal Court which convicted him of engaging in prostitution and possession of criminal tools. Appellant challenges the constitutionality of the relevant statute, arguing that it is unconstitutionally vague, overbroad, and a violation of his freedom of speech. Procedurally, Appellant also argues that the trial court improperly denied his motion to suppress, which he frames as an illegal traffic stop, which led to his arrest and the seizure of his phone. Substantively, Appellant also claims his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. For the reasons that follow, Appellant's arguments are without merit and the judgment of the trial court is affirmed.

Facts and Procedural History

**{¶2}** This matter arises from a police sting operation. Detective Daniel Haueter of the East Palestine Police Department has worked in the internet sex crimes division since 2004 and posted an advertisement on a website called "Skip the Games," which offers online prostitution and escort services as part of this undercover operation. (Suppression Hrg., p. 12.) To post an advertisement on this website, a user must create an account. Someone seeking the services advertised on a given advertisement on this site usually calls a phone number provided in the ad in order to hire the offered services. Det. Haueter posted what is called a "familial ad," which purports to offer the services of a mother and daughter team. Det. Haueter included a phone number he created through an application used by law enforcement to allow for undercover operations such as the one, here.

Case No. 25 CO 0020

{¶3}   On March 27, 2024, after one failed attempt due to poor cell phone service reception, Appellant successfully engaged in a series of text messages with Det. Haueter using the contact information in the undercover ad.   During this exchange, Appellant requested the sexual services of both the mother and daughter and asked what they would charge.  Det. Haueter responded that the rate was $240 per hour.  Appellant asked for the women's address and mentioned that he would be coming from "the north," from the Youngstown area.  Det. Haueter provided Appellant a false address.  Searching for this address would lead Appellant to a somewhat remote road that was infrequently traveled, and to an empty strip of land located between two actual buildings on this road.  Relevant to this appeal, one of those buildings houses a business named "Pure Ohio."

{¶4}   Once Appellant engaged the services listed in the ad, Appellant texted Det. Haueter that he was on his way to the assignation.  Det. Haueter arrived at the location in an unmarked vehicle and wearing plain clothes.  He parked his vehicle across the street from the Pure Ohio facility.  At least two marked police cruisers also working with the operation were nearby.

{¶5}   As evidenced by the text exchange below, Appellant repeatedly texted Det. Haueter indicating that he could not find the address.  During this exchange, Det. Haueter observed a white Jeep driving back and forth slowly, as if the driver was looking for an address.  Exhibit ten in the record is a printout from the application on Det. Haueter's phone which recorded the text message exchange, and was introduced at the suppression hearing.  The following texts are significant:

[Appellant]:  Can't find it

Haueter:  Do u see Tyr pyre ohio

[Appellant]:  Ya

Haueter:  Ok

Haueter:  If ur like pulling out

Haueter:  Of thr pyre ohio

Haueter:  Turn left

. . .

Haueter:  Where t u I'm at end of drive

Haueter:  Standing

[Appellant]:  Don't see pure Ohio

. . .

[Appellant]:  I had to turn around

. . .

[Appellant]:  By pure Ohio

[Appellant]:   Idk I can't find or see you and a lot of cops are around that way

Case No. 25 CO 0020

. . .

[Appellant]:  Stand out slide I'm gonna come by again see if I see you

Haueter:  I'm literally here

Haueter:  On left

Haueter:  U calling me???

[Sic in Passim].  (Exh. 10.)

{¶6}    Importantly, at the moment Det. Haueter received the text that Appellant was in front of the Pure Ohio building, he was able to see a white Jeep, later identified as Appellant's, stopped in front of Pure Ohio.  Appellant told Det. Haueter that he intended to turn around and go back, and then the detective saw the white Jeep turn around and proceed back down the road.  At this moment, Det. Haueter believed that he had confirmed that the person he was texting with was driving the white Jeep.  Because he was in an unmarked vehicle and plain clothes, Det. Haueter radioed a marked cruiser to initiate a stop of the white Jeep.  Immediately after the stop, officers ordered Appellant out the vehicle, handcuffed him, placed him under arrest and into the backseat of a marked cruiser.

{¶7}    Officers asked Appellant about the location of his phone, and he told them that it was inside of his car.  Officers retrieved the phone and sent a series of "test" text messages to that phone to ensure it was the same one that Det. Haueter had been communicating with throughout the investigation.  Multiple texts were sent to confirm this identification.  After discovering a total of roughly seven dollars in Appellant's vehicle,

Case No. 25 CO 0020

Officers also asked Appellant how he had planned to pay for the services he engaged. He responded that he had not been planning to pay for any services.

**{¶8}** When the officers retrieved the cell phone from Appellant's car, they immediately set the phone to "airplane mode" to prevent remote deletion of information from the phone. Importantly, officers did not search the stored contents of the phone once it was located until Appellant provided his consent. No stored information from Appellant's phone was used as evidence at trial. The only evidence offered at trial directed to Appellant's phone was Det. Haueter's testimony that he observed the "test" text messages and that they showed as notifications on the screen of Appellant's phone.

**{¶9}** On April 2, 2024, Appellant was charged with one count of engaging in prostitution, a misdemeanor of the first degree in violation of R.C. 2907.231, and one count of possessing criminal tools (the phone), a misdemeanor of the first degree in violation of R.C. 2923.24.

**{¶10}** On September 23, 2024, Appellant filed a motion to dismiss the complaint based on his assertion that the statute relative to engaging in prostitution is unconstitutionally vague or overbroad. In the alternative, Appellant argued that he possesses a protected right to privacy as to his own sexual activity in accordance with *Lawrence v. Texas,* 539 U.S. 558 (2003).

**{¶11}** On February 6, 2025, the trial court denied Appellant's motion to dismiss, determining that the statute is neither vague nor overbroad. As to vagueness, the court found that the statute clearly targets a buyer of sexual services and involves persons engaged in prostitution, as opposed to criminalizing personal intimacy, such as that between a husband and wife. The court concluded that the statute is written so that a

person of ordinary intelligence would understand what behavior is, and is not, legal under this law. As to overbreadth, the court determined that Appellant's arguments were speculative in nature. Finally, as to due process, the trial court explained that the statute does not target ordinary personal rights to date, marry, or engage in consensual sexual activity.

{¶12} On April 28, 2025, Appellant filed a motion for leave to file a motion to suppress the evidence obtained from the stop of his vehicle. Appellant based his motion on the fact that he had not been approached by police at a specific address, as the address he sought did not exist. Instead, officers stopped and detained him as he traveled along the public road. In his motion he first raised an issue with questions the officers posed to him without first providing warnings pursuant to *Miranda v. Arizona,* 86 S.Ct. 1602 (1966). He also attacked the officers' reasonable suspicion to initiate a stop of his vehicle. Appellant asserted that prior to their stop officers did not have a description of the vehicle that the man they sought was driving, so they could not specifically identify Appellant by means of his vehicle, nor could they connect him to the phone number. As to probable cause pertaining to his arrest and the seizure of his phone, Appellant argued that nothing occurred during or prior to the stop (which he characterized as a traffic stop) to provide any suspicion of criminal activity.

{¶13} Beginning with the *Miranda* issue, the court noted that the state agreed not to introduce or otherwise use any statements made by Appellant at trial. Hence, the *Miranda* issue was moot. As to the lawfulness of the stop, the court found that "[g]iven the facts and circumstances known to the police at the time, a prudent man would

conclude that [Appellant] 'had committed or was committing an offense.' " (5/30/25 J.E.) The court proceeded to detail those circumstances, including:

> 1) the Defendant's implicit agreement to pay for sexual activity; 2) Defendant's arrival at the pre-arranged location on Kemple Drive, a seldom used road in East Palestine; 3) Law enforcement's observations of him driving by the location at least twice; 4) Defendant's texts and attempted calls to the police while being observed looking for the location; 5) Defendant texted Detective Haueter and told him he was in front of the Pure Ohio marijuana business located on the road, and Haueter could actually see him at that location.

(5/30/25 J.E.)

**{¶14}** Given these facts and circumstances, the court concluded that Det. Haueter had a reasonable belief that Appellant had committed, or was committing, a criminal act. Thus, the stop of Appellant's vehicle and his subsequent arrest were lawful.

**{¶15}** The matter proceeded to trial, where a jury found Appellant guilty on all counts as charged. The trial court imposed a sentence of ninety days in jail for engaging in prostitution, but no additional jail sentence for possession of criminal tools. The court imposed fines of $500 (engaging in prostitution) and $200 (possession of criminal tools). The court also imposed a two-year probation term. The court stayed Appellant's sentence pending appeal. A second judgment entry describing the terms of Appellant's probation noted that his ninety-day sentence was suspended. This timely appeal followed.

<u>ASSIGNMENT OF ERROR NO. 1</u>

The trial court erred in failing to find Ohio Revised Code 2907.231(B) unconstitutionally vague in violation of the Ohio and United States Constitutions.

{¶16} Appellant recognizes that the relevant statute prohibits "sexual activity for hire," and defines this as an "implicit or explicit agreement to provide sexual activity in exchange for anything of value." Appellant urges, however, that this language is vague, as it is "broad and infinite." (Appellant's Brf., p. 9.) Appellant specifically takes issue with the phrase "anything of value." Appellant contends that ordinary persons would not be able to discern whether their sexual relationships are at odds with the behavior so vaguely described within the statute.

{¶17} Appellant also contends that the statute affects freedom of speech and expression. The statute criminalizes enticing another to engage in sexual conduct. Appellant likens the term "entice" to terms such as "tempt, allure, or attract." (Appellant's Brf., p. 12.) Appellant concludes that this language intrudes into freedom of speech, as ordinary attempts by someone to seek a sexual relationship could implicate criminal behavior under this language.

{¶18} The statute at issue is found in R.C. 2907.231(B), which provides: "[n]o person shall recklessly induce, entice, or procure another to engage in sexual activity for hire in exchange for the person giving anything of value to the other person." Although this statute does not define "anything of value," it has been defined through R.C. 1.03, and includes money.

<u>Case No. 25 CO 0020</u>

**{¶19}** Emphasizing the strong presumption of the constitutionality of a statute, the state explains that it was enacted for the purpose of combating human trafficking and complying with federal law. The state urges that a person of ordinary intelligence could easily discern that the statute criminalizes the specific behavior of paying another person for sexual activity. Although Appellant's vagueness argument addresses the understanding of a reasonable person, the state notes that Appellant certainly knew his conduct was illegal, as he asked Det. Haueter if he was a law enforcement officer during their initial undercover discussions and expressed concern when he texted Det. Haueter (whom he believed was a prostitute) that police were in the area the night of his arrest.

**{¶20}** The interpretation of a statute presents a question of law and is reviewed de novo. *State v. Bielski*, 2013-Ohio-5771, ¶ 8 (7th Dist.). Statutes are presumed constitutional. *Sorrell v. Thevenir*, 69 Ohio St.3d 415, 418-419 (1994). In order to overcome this presumption, the challenger must "meet the burden of establishing beyond a reasonable doubt that the statute is unconstitutional." *Bielski* at ¶ 9, citing *State v. Tooley*, 2007-Ohio-3698, ¶ 29.

**{¶21}** The "void-for-vagueness" doctrine implicates due process concerns, as laws must "provide fair notice and prevent arbitrary enforcement." *In re Columbus S. Power Co.*, 2012-Ohio-5690, ¶ 20. Accordingly, for a statute to be upheld as constitutional, it must: (1) provide fair warning about what conduct is proscribed, (2) preclude arbitrary, capricious, and discriminatory enforcement, and (3) not unreasonably impinge on constitutionally protected rights. *Huron v. Kisil*, 2025-Ohio-2921, ¶ 11, citing *State v. Collier*, 62 Ohio St.3d 267, 269-270 (1991); *State v. Tanner*, 15 Ohio St.3d 1, 3

(1984); *Grayned v. Rockford*, 408 U.S. 104, 108-109 (1972); and *United States v. Williams*, 553 U.S. 285, 304 (2008).

**{¶22}** A party challenging a statute as unconstitutionally vague must demonstrate that "the statute is vague 'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.' " *Kisil* at ¶ 10, quoting *Columbus Power* at ¶ 20; *State v. Anderson*, 57 Ohio St.3d 168, 171 (1991); *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971). A person raising a constitutional challenge "cannot mount a successful void-for-vagueness challenge if his conduct clearly falls within the activities proscribed by law." citing *Kisil* at ¶ 15.

**{¶23}** Statutes promoting health, safety, and welfare are afforded a strong presumption of constitutionality. *Kisil* at ¶ 11, quoting *Anderson* at 171, citing *State ex rel. Jackman v. Cuyahoga Cty. Court of Common Pleas*, 9 Ohio St.2d 159 (1967). However, laws imposing criminal sanctions require more stringent review because the penalties are more severe. *Kisil* at ¶ 11, quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-499 (1982) and *Columbus Power* at ¶ 13.

**{¶24}** Recently, we addressed these exact arguments in *State v. George,* 2026-Ohio-324 (7th Dist.) and *State v. Clavin,* 2026-Ohio-325, ¶ 17 (7th Dist). In *George,* we found that the appellant's conduct fell plainly within the purview of the statute, as he sought out prostitution-based services from the same website at issue as in the instant case. *Id.* at ¶ 18. During his phone call with an undercover officer, the appellant not only sought out sexual services but agreed upon a price of $100. Again, the statute defines anything of value to include money. Because the agreed upon $100 price for the sexual

services sought is "anything of value," we held that the appellant's conduct fell squarely within that definition. Thus the appellant could not sustain a challenge to the statute based on vagueness claims. *Id.* at ¶ 19.

**{¶25}** The same issue arose in *Clavin.* The appellant in that case also sought services on the same website and requested sexual services in exchange for $140. *Id.* at ¶ 18. Because the appellant agreed to pay $140, which is definitionally "anything of value," we held that he could not raise a vagueness claim. *Id.* at ¶ 18.

**{¶26}** In this matter, Appellant is likewise unable to support his contention. Appellant sought sexual services, and agreed on a rate of $240 in exchange for those services. The $240 is without question a monetary exchange, specifically included in the statute's definition of "anything of value." Because Appellant's conduct falls squarely within the confines of the statute's prohibition by definition, Appellant cannot sustain his vagueness challenge to the statute. Accordingly, Appellant's first assignment of error is without merit and is overruled.

ASSIGNMENT OF ERROR NO. 2

The trial court erred in failing to find Ohio Revised Code 2907.231(B) unconstitutionally broad, in violation of the Ohio and United States Constitutions.

**{¶27}** Appellant next contends that the statute prohibiting engaging in prostitution involves constitutionally protected activities and there is no delineation between constitutionally protected conduct and illegal prostitution. Appellant suggests that anything that may have emotional, informational, or monetary value would fall within the

definition "anything of value." Appellant posits that ordinary relationships involve value in terms of moral support, financial support, companionship, love, and physical intimacy. Appellant also points to "unconventional relationships" such as one-night stands and "friends with benefits" relationships. Appellant claims that every relationship involves an implicit or explicit exchange of something for value for sexual activity.

{¶28} The state responds that a person of ordinary intelligence would not understand the statute to criminalize the sexual situations posited by Appellant, such as one-night stands, "friends with benefits," multiple relationships, etc.

{¶29} "When a court applies the overbreadth doctrine, the statute or ordinance in question is declared to be facially invalid. For this reason, it has been said that the overbreadth doctrine is 'manifestly strong medicine' that is employed sparingly, and only as a last resort." (Internal citations omitted.) *State v. Adams*, 2004-Ohio-3199, ¶ 13, (7th Dist.), citing *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973).

{¶30} A party asserting a First Amendment overbreadth challenge must show that "a substantial number of [the law's] applications are unconstitutional, judged in relation to [the law's] plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010). "The first step in overbreadth analysis is to construe the challenged [law]; it is impossible to determine whether a [law] reaches too far without first knowing what the [law] covers." *United States v. Williams*, 553 U.S. 285, 293 (2008).

{¶31} In *George* and *Clavin,* we explained that the relevant prostitution statute focuses on prohibited conduct rather than speech, expression, or association. *George* at ¶ 27; *Clavin* at ¶ 27. We noted that prostitution does not involve a constitutionally protected right and its speech related aspect is limited to the act of arranging for the

sexual activity in return for something of value, usually monetary. *George* at ¶ 28; *Clavin* at ¶ 28. Accordingly, we held that the statute is narrowly tailored to prohibiting hiring a person for purposes of engaging in sexual activity in exchange for something of value. *Id.* Our precedent mandates the same result, here. Hence, Appellant's second assignment of error is without merit and is overruled.

ASSIGNMENT OF ERROR NO. 3

> The trial court erred in failing to recognize that Ohio Revised Code 2907.231(B) violates Appellant's fundamental right to liberty and privacy under the Due Process Clauses of the Ohio and United States Constitutions.

{¶32} While Appellant concedes that the state has a compelling interest in protecting minor victims, he argues that the statute goes well beyond that interest and restricts the ability of consenting adults to choose how they conduct themselves in their private lives. Appellant notes that the prostitution statute has moved from police operations on the street level to engaging in private phone conversations to lure a person to a location for arrest. Appellant claims that officers are given unbridled discretion in determining whether to charge a person under the statute.

{¶33} The state again contends that the statute does not prohibit constitutionally protected relationships. Appellant cannot assert a privacy interest in sex for hire or human trafficking. As the claimed interest does not involve a fundamental right, the state concludes that the statute need only have a reasonable relationship to some legitimate governmental interest, which it does: protecting against human trafficking. As to the case

on which Appellant relies, *Lawrence,* the state distinguishes it from the instant matter, as *Lawrence* does not stand for the proposition that individuals possess a fundamental right to any and all consensual sexual activity, such as prostitution.

**{¶34}** Where the constitutionality of a statute is challenged, it must be established "beyond a reasonable doubt that the legislation and constitutional provisions are clearly incompatible." *State v. Grevious*, 2022-Ohio-4361, ¶ 9, quoting *State ex rel. Dickman v. Defenbacher*, 164 Ohio St. 142 (1955), paragraph one of the syllabus. Any "doubts regarding the validity of a legislative enactment are to be resolved in favor of the statute." *State v. Gill*, 63 Ohio St.3d 53, 55 (1992).

**{¶35}** There are two types of First Amendment challenges: a challenge to the statute on its face, and a challenge as applied to a specific circumstance. In the event of a facial challenge, "the challenging party [must] show that the statute is vague 'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.' " *State v. Anderson*, 57 Ohio St.3d 168, 171 (1991), quoting *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971). If the challenge is as applied, the challenger must demonstrate that the "application of the statute in the particular context in which he has acted, or in which he proposes to act, [is] unconstitutional." *State v. Lowe*, 2007-Ohio-606, ¶ 17. Here, Appellant seeks to challenge the constitutionality of the statute prohibiting engaging in prostitution on its face.

**{¶36}** Again, we addressed this issue in *George* and *Clavin.* In those cases, we explained that *Lawrence* did not create a new fundamental right to engage in prostitution, nor did it create a right to exchange something of value in return for sexual activity.

*George* at ¶ 43, *Clavin* at ¶ 43. In applying the rational basis test, we held that the statute is rationally related to the state's interests in protecting public safety, controlling a potential health hazard, preventing the sexual commercialization of children or those unable to provide consent. *George* at ¶ 46; *Clavin* at ¶ 46. Consequently, Appellant's third assignment of error is without merit and is overruled.

ASSIGNMENT OF ERROR NO. 6

> The trial court erred in denying Appellant's Motion to Suppress evidence stemming from an illegal seizure of himself and a search of his property in violation of his Fourth Amendment rights under the United States Constitution and his rights under Article I, Section 14 of the Ohio Constitution.

{¶37} As Appellant's motion to suppress arguments are best addressed before reaching his manifest weight and sufficiency of the evidence arguments, we will address this assignment out of order.

{¶38} Appellant appears to frame the stop of his vehicle as a "traffic stop." Ordinarily, such a stop would require police to have observed Appellant commit some traffic infraction in order to justify the stop of his vehicle. Despite Appellant's attempts to classify the stop as an ordinary traffic stop, this matter involves a *Terry* stop based on the existence of reasonable suspicion that Appellant is or was involved in criminal activity. Thus, officers did not need to have observed a traffic infraction to initiate a stop.

{¶39} As to reasonable suspicion, Appellant argues that officers had no description of the vehicle operated by the person on the phone. Officers also had not

linked Appellant to the phone number used to engage in conversations with Det. Haueter prior to his stop. Appellant complains that he was handcuffed immediately after the stop, despite the fact that he had not engaged in any behavior to justify his detainment or arrest at that point. Appellant argues that officers did not obtain his phone until after arresting him, thus any information or confirmation provided by possession of his phone cannot be "bootstrapped" to establish reasonable suspicion or probable cause.

{¶40} The state frames Appellant's stop as one permitted by *Terry v. Ohio,* 392 U.S. 1 (1968). Such a stop must be supported by reasonable suspicion that a crime has been or is about to be committed. Based on the totality of the circumstances, here, the state asserts that the officers had reasonable suspicion to stop and detain Appellant. Among those circumstances, the state points to the first set of text messages received by Det. Haueter where Appellant sought to procure the services of a mother-daughter team for sexual purposes and requested the "rates" for those services. Appellant also specifically asked whether Det. Haueter was a police officer at the time he first requested these services.

{¶41} At the scene, the state relies on the fact that Appellant repeatedly texted Det. Haueter, whom he believed was a prostitute, stating that he was having trouble locating the address for their rendezvous. He specifically stated that he had to turn his vehicle around and stated his concern that he saw several police cars in the area. Det. Haueter watched Appellant's vehicle travel back and forth on the street searching for the rendezvous point as the detective received Appellant's text messages.

{¶42} The motion to suppress Appellant filed in the trial court was three pronged, as it sought to exclude: 1) evidence obtained from the initial stop, 2) evidence leading to

the detainment of Appellant, and 3) questions police asked without a *Miranda* warning. However, on appeal Appellant does not raise his *Miranda* argument, likely because the state agreed not to use any of Appellant's statements as evidence at trial.

**{¶43}** In the state's response to Appellant's motion to suppress, the state conceded possible error as to the questions the officers asked Appellant without first providing him a *Miranda* warning. As part of that concession, the state agreed not to use those statements during trial. Thus, the state essentially agreed that those statements must be suppressed. This was noted within the trial court's judgment entry. In any event, as Appellant has abandoned the issue in this appeal and Appellant raises no arguments regarding those statements, this issue has been waived for appellate purposes.

**{¶44}** A motion to suppress presents mixed issues of law and fact. *State v. Lake*, 2003-Ohio-332, ¶ 12 (7th Dist.), citing *State v. Jedd*, 146 Ohio App.3d 167, 171 (4th Dist. 2001). If a trial court's findings of fact are supported by competent credible evidence, an appellate court must accept them. *Id*. The court must then determine whether the trial court's decision met the applicable legal standard. *Id*.

**{¶45}** Beginning with the stop itself, there is no question that a traditional traffic stop did not occur in this case. Police officers did not initiate a stop of Appellant's vehicle for a traffic violation. Appellant, in his vehicle, was stopped because they had reasonable suspicion to believe Appellant had committed the criminal offense of engaging in prostitution. Thus, Appellant is mistaken in his belief that the matter is to be reviewed and decided based on Ohio law pertaining solely to traffic stops. Our review is based on the broader area of law addressing reasonable suspicion and *Terry* stops.

**{¶46}** "Reasonable suspicion" is different than "probable cause," and its analysis is prompted by different circumstances. Reasonable suspicion is a lesser standard than probable cause. However, the Ohio State Supreme Court has explained that:

> Precisely defining "reasonable suspicion" is not possible, and as such, the reasonable-suspicion standard is " 'not readily, or even usefully, reduced to a neat set of legal rules.' " . . . The level of suspicion required to meet the reasonable-suspicion standard "is obviously less demanding than that for probable cause" and "is considerably less than proof of wrongdoing by a preponderance of the evidence" but is 'something more than an "inchoate and unparticularized suspicion or "hunch." '

*State v. Hawkins*, 2019-Ohio-4210, ¶ 20.

**{¶47}** The *Hawkins* Court also explained that " '[a] determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct.' [*United States v. Arvizu*, 534 U.S. 266] at 277, 122 S.Ct. 744. In permitting detentions based on reasonable suspicion, '*Terry* accepts the risk that officers may stop innocent people.' " *Hawkins* at ¶ 22, citing *Illinois v. Wardlow*, 528 U.S. 119, 126 (2000).

**{¶48}** With this mind, we turn to the landmark *Terry* case. In *Terry,* two men attracted the attention of a plain clothed police officer. *Id.* at *5. He watched as the two men walked, one at a time, up and down the street, peering into a store window. He saw the men briefly confer with one another, and then repeat the same conduct at least five or six times. Finding the behavior suspicious, the officer watched as the two men appeared to confer with a third man who had joined them. *Id.* at *6. The officer

approached the men, identified himself as a police officer, and asked for identification.  At that point, the officer knew nothing personally incriminating about the three men, and possessed only knowledge of their suspicious actions.  At some point in their encounter the officer spun one of the men around and patted him down, and discovered a pistol in the man's pocket.  *Id.* at *7.  The officer then ordered the men into a store and patted down all three to determine if they had a weapon.  A firearm was found on two of the men, who were arrested for carrying a concealed weapon.

**{¶49}** The United States Supreme Court held that the officer's actions were reasonable, as the behavior of the three men led the officer to fear that they were "casing" the store in order to effectuate a robbery.  The Court noted that the officer limited his search to "what was minimally necessary to learn whether the men were armed and to disarm them once he discovered the weapons. He did not conduct a general exploratory search for whatever evidence of criminal activity he might find."  *Id.* at *30.  Because the officer had reasonable suspicion that a robbery may be about to take place and limited his search for discovery of the particular items of concern, the Court held that the motion to suppress had properly been denied.

**{¶50}** In this case, there is an abundance of evidence providing the officers with reasonable suspicion to believe that Appellant was committing the offense of engaging in prostitution; certainly more than the officer in *Terry* had available at the time of that stop. Det. Haueter testified that he has worked to investigate internet sex crimes since 2004 and continues to work in that sector to the present day.  He testified as to significant expertise in investigating these issues.

**{¶51}** Significantly, once Appellant sought the services set out in the ad, Det. Haueter provided Appellant with a false address, leading him to a remote area of roadway that did not abut any particular physical structure. (5/13/25 Suppression Hrg., p. 18.) This area was located between two large factories, one of which is called "Pure Ohio." The road is littered with potholes and is described as having very little to no traffic, making it an ideal location for officers to use in these cases.

**{¶52}** At the agreed upon time, Det. Haueter watched as a white Jeep drove in the area between the two factories "very slowly" while it appeared that the driver was looking for something. (5/13/25 Suppression Hrg., p. 19.) Det. Haueter watched the vehicle pass by the area and then turn around and pass by again. During this time, Det. Haueter received a number of texts from Appellant indicating that he could not find the address the detective had given him. Appellant texted Det. Haueter to inform him that he was in front of Pure Ohio and planned to turn around. At that moment, the white Jeep Det. Haueter had been observing paused in front of the Pure Ohio building, and it then turned around. (5/13/25 Suppression Hrg., p. 20.)

**{¶53}** This record reflects that Det. Haueter had reasonable suspicion to believe that Appellant, the person operating the vehicle, had committed the crime of engaging in prostitution, allowing him to stop the vehicle. Contrary to Appellant's argument, officers stopped him not because he merely happened to be in the area, but because he drove his vehicle slowly along this remote stretch of road acting in a manner indicating he was searching for a specific location. He drove past the Pure Ohio facility twice before stopping in front of the building, all the while texting with Det. Haueter.

**{¶54}** As the vehicle was stopped in front of the Pure Ohio building, Det. Haueter received a text message stating that Appellant was stopped in front of that building and planned to turn around to continue his search. No other vehicle was observed in front of that building at the time. This was sufficient for Det. Haueter to conclude that the person operating that white Jeep was the same person with whom he had been, and was still, exchanging text messages. The person he was texting had responded to the ad, arranged to receive sexual services, and arranged the monetary amount he was to pay for those services, a criminal offense under Ohio law.

**{¶55}** In *Hawkins,* a law enforcement officer checked BMV records on a vehicle which he had seen engage in some questionable maneuver. *Id.* at ¶ 5. The report obtained from the BMV revealed that the vehicle was registered as a white GMC, however, the vehicle he observed with those plates was a black GMC. On that basis, the officer initiated a traffic stop to investigate the discrepancy in the vehicle's color. At some point during the stop, the officer learned through dispatch that the operator did not have a valid driver's license and an active warrant against him was outstanding. *Id.* at ¶ 8. The Ohio Supreme Court held that the discrepancy in the color of a vehicle gave the officer reasonable suspicion to initiate a stop, even though such discrepancy could have been innocently caused. *Id.* at ¶ 23. Here, Det. Haueter had much more evidence of actual wrongdoing than the officer in *Hawkins.* Based on these facts and circumstances, Det. Haueter unquestionably had reasonable suspicion to initiate a stop of Appellant in his vehicle, pursuant to *Terry.*

**{¶56}** Again, reasonable suspicion to stop does not justify an arrest. In order to effectuate an arrest, an officer must have probable cause a crime has occurred. *State v.*

*Griffith,* 2011-Ohio-6410, ¶ 13, citing *State v. Homan,* 89 Ohio St.3d 421, 427 (2000). Probable cause is a fluid concept, similar to reasonable suspicion but rising to a heightened standard. Probable cause is said to turn "on the assessment of probabilities in particular factual contexts." *State v. Martin*, 2022-Ohio-4175, ¶ 16, citing *Maryland v. Pringle*, 540 U.S. 366, 371 (2003); *Illinois v. Gates*, 462 U.S. 213, 232 (1983).

> "[T]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt . . ." *Id*. at 371, 124 S.Ct. 795, quoting *Brinegar* at 175, 69 S.Ct. 1302. Thus, probable cause exists when the facts and circumstances are sufficient to provide a reasonable belief that the accused has committed a crime. *Brinegar* at 175-176, 69 S.Ct. 1302, citing *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925). The inquiry requires the judge to review all the circumstances and make "a practical, common-sense decision" as to whether probable cause is present. *Gates* at 238, 103 S.Ct. 2317.

*Id.* at ¶ 17.

{¶57} While probable cause has neither a precise definition nor a "quantification of percentages," it requires "more than bare suspicion," and the facts and circumstances "must demonstrate a 'fair probability' that a crime has been committed." *Id.* at ¶ 18, citing *Brinegar* at 175; *Gates* at 238.

{¶58} This record also reveals that officers unquestionably had probable cause to effectuate an arrest of Appellant. As earlier addressed, Det. Haueter visually observed Appellant's white Jeep drive back and forth while Appellant texted Det. Haueter several

times saying that he could not find the address he was given once Appellant engaged the services of a presumed prostitute. While operating a vehicle on a road is not a crime, it was clear that the driver of that Jeep was looking for something and could not find it. Appellant also expressed concern to the "prostitute" he believed he had hired in these texts that he saw police activity in the area.

**{¶59}** At some point, Det. Haueter received a text message that Appellant was in front of Pure Ohio and intended to turn around. No other vehicles were seen in the area. Det. Haueter saw the white Jeep in front of Pure Ohio and watched it turn around. It was clear that the driver of that Jeep was the same person texting Det. Haueter. There is no question that the person texting Det. Haueter is the same person who arranged to obtain the services of a prostitute earlier, also by texting Det. Haueter. Appellant essentially identified himself as the man on the phone by texting his whereabouts and allowing officers to observe him at the exact location provided in the sting at the time, providing officers with probable cause to effectuate an arrest.

**{¶60}** As to the officers' efforts in retrieving Appellant's phone from the Jeep, officers located the phone in or on top of the center console. Even if officers had not asked Appellant about the location of his phone, they knew his phone was either on his person or inside the vehicle, as he had been using it to text Det. Haueter. Officers conducted a pat down of Appellant and did not detect anything that felt like a cellphone. Hence, officers knew the phone was inside the vehicle and knew it had been used in furtherance of the offense at issue.

**{¶61}** "A police officer has probable cause to conduct a search when 'the facts available to [him] would 'warrant a [person] of reasonable caution in the belief' that

contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 243 (2013), citing *Texas v. Brown*, 460 U.S. 730, 742 (1983). Officers knew the phone was inside the vehicle, because it was not located on Appellant's person. Once officers established probable cause that the phone (evidence of a crime) was inside the vehicle, they were lawfully permitted to search the vehicle based on the automobile exception to the warrant requirement.

{¶62} The automobile exception "was created based on the ready mobility of automobiles and the lesser expectations of privacy surrounding an automobile." *State v. Green*, 2023-Ohio-4503, ¶ 23 (7th Dist.), citing *California v. Carney*, 471 U.S. 386, 391 (1985). Pursuant to the automobile exception, where "probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *State v. Vega,* 2018-Ohio-4002, ¶ 13, quoting *United States v. Ross*, 456 U.S. 798, 825 (1982). Thus, once probable cause is established, officers need not establish exigency to search a vehicle.

{¶63} Det. Haueter testified it was urgent for police to secure the phone to avoid remote deletion of evidence. According to Det. Haueter, cell phones can be remotely "wiped" by someone "log[ging] into their account, resetting their phone, manually erasing the data." (5/13/25 Suppression Hrg., p. 27.) Thus, police officers typically attempt to swiftly place the cellphones on "airplane mode" or remove the Sim card. He noted that neither technique involves an actual search of the contents of the device.

{¶64} Here, officers seized Appellant's phone based on the automobile exception to the warrant requirement as evidence of the crime and to prevent the phone from being remotely destroyed until either consent could be obtained for its search, or a warrant

obtained to search. In this matter, Appellant did consent to a search of his cellphone. Det. Haueter testified that he did not conduct any search until Appellant signed a consent form. Hence, this record reflects that both the seizure and search of the phone were lawfully conducted. Accordingly, Appellant's sixth assignment of error is without merit and is overruled.

ASSIGNMENTS OF ERROR NOS. 4 and 5

The convictions for engaging in prostitution and criminal tools were based on insufficient evidence.

The convictions for engaging in prostitution and criminal tools were against the manifest weight of the evidence.

**{¶65}** Appellant attacks his convictions on both charges: engaging in prostitution and possession of criminal tools. Regarding sufficiency, Appellant provides a four sentence argument addressing both convictions, together. Appellant limits his arguments to his claim that there is no evidence of record he understood what "full service" meant, or that it included sexual activity. He also argues that officers found very little money on his person, so he had no means of paying for that service. As to the manifest weight of the evidence, Appellant limits his argument to one line, concluding "[i]n this case, the manifest weight of the evidence and all reasonable inferences weigh in favor of Appellant." (Appellant's Brf., p. 19.)

**{¶66}** The state responds that Appellant searched for and assessed the website in question, which has a title page stating "skip the games, get satisfaction." The state explains that the website was created shortly after "Backpage" and "Craiglist" were shut

down because they had contributed to the human trafficking epidemic. The website provides a definition page, which defines "full services" as "sexual intercourse, equates to completion." (Appellee Brf., p. 14.) The website also includes a section addressing safety precautions and how to evade the law. When messaging Det. Haueter, whom Appellant believed to be a prostitute, the state notes that Appellant used common terminology such as asking for the "rates." Appellant specifically asked Det. Haueter whether he was "a cop."

{¶67} In addressing Appellant's stop, the state explains that Det. Haueter watched the white Jeep drive back and forth as Appellant, using the same phone number used to hire the services initially, texted him that he was having trouble finding the rendezvous address and had to turn around. Appellant texted a warning that there were a number of police in the area. After he was detained, police texted the phone number Det. Haueter had been receiving these messages from with a "test" message, and it alerted as a notification on Appellant's phone. As to Appellant's argument regarding his lack of ability to pay for the agreed services, the state explains that buyers often "abscond" without completing payment, or use non-cash apps such as Venmo and PayPal to pay for these services.

{¶68} Appellant's arguments are very bare-boned. Again, Appellant was convicted of engaging in prostitution and possession of criminal tools. Engaging in prostitution is addressed in R.C. 2907.231(B), which provides that "[n]o person shall recklessly induce, entice, or procure another to engage in sexual activity for hire in exchange for the person giving anything of value to the other person."

**{¶69}** Possession of criminal tools is delineated within R.C. 2923.24, which provides in relevant part:

(A) No person shall possess or have under the person's control any substance, device, instrument, or article, with purpose to use it criminally.

(B) Each of the following constitutes prima-facie evidence of criminal purpose:

(1) Possession or control of any dangerous ordnance, or the materials or parts for making dangerous ordnance, in the absence of circumstances indicating the dangerous ordnance, materials, or parts are intended for legitimate use;

(2) Possession or control of any substance, device, instrument, or article designed or specially adapted for criminal use;

(3) Possession or control of any substance, device, instrument, or article commonly used for criminal purposes, under circumstances indicating the item is intended for criminal use.

**{¶70}** The "tool" at issue, here, was the cell phone Appellant used to procure the services of a prostitute. Appellant used the cell phone as an instrument to facilitate this offense.

**{¶71}** The sole witness at trial on this issue was Det. Haueter. Beginning with the charge of engaging in prostitution, the state was required to submit evidence

demonstrating that Appellant recklessly induced, enticed, or procured another to engage in sexual activity for hire in exchange for the person giving anything of value to the other person.

**{¶72}** Det. Haueter testified that he has extensive experience investigating human trafficking, as he has worked in the online sex crimes division since 2004. As part of his investigations, he has significant experience investigating pornography cases. He testified that he "almost exclusively" uses the specific website "Skip the Games" to investigate prostitution-related crimes. (Trial Tr., p. 149.) Det. Haueter testified that while an account is not required to peruse and engage with advertisers, an account is required to create an ad. He explained that he has a law enforcement application on his cell phone which allows him to text in an undercover fashion.

**{¶73}** On the website, the person seeking services must initiate contact with the advertiser. (Trial Tr., p. 158.) Det. Haueter has no way of knowing who has looked at an advertisement unless someone initiates contact by calling the phone number associated with the ad. Det. Haueter testified in regard to an exhibit introduced at trial. This exhibit is a screenshot of a section of the website providing definitions for the terminology used throughout the website. Among those definitions is a reference to "full service," which is described as "sexual intercourse, equate to completion." (Trial Tr., p. 164.) Also on the website is a section informing the user "how to avoid getting in trouble."

**{¶74}** On March 27, 2024, Det. Haueter posted what he referred to as a "familial trafficking ad" that purported to offer the services of a mother and daughter tandem team. (Trial Tr., p. 168.) Det. Haueter set up an undercover phone number through a law enforcement application called "LETS," an acronym for Law Enforcement Technology

Systems. (Trial Tr., p. 172.) The app saves all the phone information, including text messages, to be used for the ensuing prosecution. On the date in question, Det. Haueter received a response from Appellant. Among the questions asked by Appellant was an inquiry into the prostitute's "rates." (Trial Tr., p. 177.) Det. Haueter responded that the charges for services were $100 for one-half of an hour, $180 for an hour for the full service of one of the women. For both, the rates increased to $160 for a half hour and $240 for an hour. (Trial Tr., p. 178.)

{¶75} Appellant indicated he wanted the services of both women and inquired as to whether Det. Haueter was "a cop." (Trial Tr., p. 178.) After Det. Haueter said "no," Appellant asked for the "addy," which refers to the location or the address where the services will be provided. (Trial Tr., p. 178.) Det. Haueter sent a false address that does not correspond to an actual structure. Rather, it is a random point on a low-traffic road located between two facilities, one of which is called the "Pure Ohio" facility. Around 5:36 p.m., Appellant texted that he was "en route," meaning he was on his way to meet at the address. (Trial Tr., p. 179.)

{¶76} Around 6:03 p.m., Appellant texted that he could not find the house. At this point, Det. Haueter was anchored across the street from the Pure Ohio facility. (Trial Tr., p. 181.) Appellant and Det. Haueter texted back and forth. Appellant indicated several times that he could not find the location and Det. Haueter continued to give him instructions.

{¶77} Det. Haueter explained that, without any prior specific information about the vehicle being used, he looked for a vehicle travelling in a manner suggesting that the driver was looking for an address. Det. Haueter saw a vehicle, a white Jeep, that was

being driven in a manner matching that behavior. This vehicle was "traveling up the road slow, then travel (sic) back up the road slow, and then it ends up by the Pure Ohio Plant eventually." (Trial Tr., p. 183.) Appellant also texted Det. Haueter to alert him that there were several police cars in the area. Around 6:17 p.m., Appellant texted Det. Haueter stating that he was by Pure Ohio. Det. Haueter looked across the street and saw "the white jeep by the Pure Ohio, in that area. Almost stopped on the road, maybe crawling a little bit. But it stays in that area for a few minutes." (Trial Tr., p. 184.) Det. Haueter waited for the Jeep to pass him so he could shut down that end of the road, and radioed to a marked cruiser driven by a uniformed officer to initiate a stop of the vehicle.

{¶78} Det. Haueter testified that, thereafter, he sent the phone number of the device used to respond to the ad and communicate with the detective several texts with the word "test" to confirm that Appellant's phone was the one he had been texting with that night. He explained that he sends several texts to make sure that someone else does not happen to be texting the phone at the same time as police. In other words, he sought to ensure that it was his phone causing Appellant's phone to alert. (Trial Tr., p. 188.)

{¶79} While Det. Haueter admitted that only about seven dollars were found in Appellant's vehicle, he explained that they did not do a full search of Appellant's person and money may have been hidden in his sock, shoes, or body cavity. Even so, Det. Haueter explained that payment could be made through an app such as Venmo or PayPal. (Trial Tr., p. 230.)

{¶80} From all of this evidence, the state met its burden of proving each element of both crimes. It is clear that the jury believed Det. Haueter's version of the events and

there is nothing within the record to suggest such belief was unreasonable. Accordingly, Appellant's fourth and fifth assignments of error are without merit and are overruled.

### Conclusion

**{¶81}** Appellant challenges the constitutionality of the statute prohibiting engaging in prostitution, arguing that it is in unconstitutionally vague, overbroad, and a violation of his freedom of speech. Procedurally, Appellant also argues that the trial court improperly denied his motion to suppress, which he frames an illegal traffic stop, which led to his arrest and the seizure of his phone. Substantively, Appellant attacks his convictions, arguing that they are not supported by sufficient evidence and are against the manifest weight of the evidence. For the reasons provided, Appellant's arguments are without merit and the judgment of the trial court is affirmed.

Robb, J. concurs.

Hanni, J. concurs in part and dissents in part with concurring in part and dissenting in part opinion.

Hanni, J., concurring in part and dissenting in part, with an opinion.

**{¶82}** I concur with the majority that Appellant's first, second, and third assignments of error lack merit. However, with regard and respect to my colleagues, I dissent from the majority opinion finding no merit to Appellant's sixth assignment of error. Consequently, I would decline to address Appellant's fourth and fifth assignments of error due to a reversal and remand.

**{¶83}** Appellant presented two particular issues in his suppression motion that were argued at the suppression hearing and addressed by the trial court in denying his motion. The first concerns law enforcement's failure to advise Appellant of his rights under *Miranda v. Arizona,* 384 U.S. 436 (1966). The second is law enforcement's seizure of Appellant's cell phone and confirmation of Detective Haueter's "test" text sent to Appellant's phone.

**{¶84}** Appellant was clearly in custody when police questioned him about his method of payment for services and the location of his cell phone. Appellant answered these questions while handcuffed in the backseat of the police vehicle. He informed officers that the objects were located in his vehicle. Appellant was not advised of his rights under *Miranda* at any time.

**{¶85}** Impliedly conceding this error, the prosecution agreed not to use at trial any statements Appellant made at that time. I would also apply the exclusionary rule to Appellant's cell phone and any money found in his vehicle due to the *Miranda* violation. *See State v. Farris,* 2006-Ohio-3255, ¶ 48-49 (Ohio Constitution provides more protection than United States Constitution in that violation of *Miranda* warnings can result in exclusion of physical evidence as well as testimonial evidence).

**{¶86}** To sanction the warrantless search of Appellant's vehicle and cell phone, the trial court relied on the warrant exceptions of the search incident to arrest and the mobility of the vehicle. However, Appellant was already detained, handcuffed, and sitting in the back seat of the police vehicle. He was clearly separated from his vehicle and his phone. Thus, the safety of law enforcement and the public were not threatened and there was no chance that he would drive his vehicle away. I disagree with the majority's presumption that the cell phone would have been found in the vehicle merely because it was not found on Appellant's person. Appellant could have thrown the cell phone out of the window or dropped it under his vehicle.

**{¶87}** Moreover, and even presuming the search of Appellant's vehicle was legally incident to his arrest, police did not have the right to search the contents of his cell phone, even for the confirmation "test" text sent by Detective Haueter. In *Riley v. California*, 573 U.S. 373, 403 (2014), the United States Supreme Court held that police must secure a search warrant before searching a cell phone incident to an arrest. Although Detective Haueter testified that Appellant provided consent to search his cell phone, this did not occur until after police had already seized the cell phone and confirmed the text.

**{¶88}** Accordingly, I would find merit to Appellant's sixth assignment of error by finding that the trial court erred in denying his motion to suppress. Consequently, I would decline to address his fourth and fifth assignments of error based upon a reversal and remand to the trial court.

[Cite as *State v. Gore*, 2026-Ohio-1488.]

_____

For the reasons stated in the Opinion rendered herein, Appellant's assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Columbiana County Municipal Court, of Columbiana County, Ohio, is affirmed. Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**